UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) No. 18-cv-2399 (KBJ) |
| FEDERAL BUREAU OF PRISONS and DEPARTMENT OF JUSTICE, | ) ) ) ) |
| Defendants. | ) ) ) |

## DECLARATION OF JOHN E. CUNNINGHAM III

I, John E. Cunningham III, declare the following to be a true and correct statement of facts:

1. I am a Trial Attorney in the United States Department of Justice (DOJ), Criminal Division (the "Criminal Division" and/or "CRM"), and am currently assigned to the Freedom of Information Act (FOIA) and Privacy Act (PA) Unit, a component of the Office of Enforcement Operations (OEO), where I have worked since November 7, 2011. I have been employed as a Trial Attorney with DOJ since October 1998. From October 13, 1998 to November 7, 2011, I was employed by the Fraud Section of the Criminal Division.

2. The FOIA/PA Unit is responsible for processing FOIA/PA requests seeking information from the Criminal Division. FOIA/PA Unit staff determine whether the Criminal Division maintains records responsive to FOIA requests, and if so, whether they can be released in accordance with the FOIA/PA. In processing such requests, the FOIA/PA Unit consults with other components within the DOJ, as well as with other Executive Branch agencies.

1

3. In my capacity as a Trial Attorney in the FOIA/PA Unit, and in conjunction with the Chief, Deputy Chief, and Associate Chief of the FOIA/PA Unit, I assist in supervising the handling of FOIA and PA requests processed by the FOIA/PA Unit. I am responsible for providing litigation support and assistance to Assistant United States Attorneys and Civil Division Trial Attorneys who represent DOJ in lawsuits filed in federal court under the FOIA, 5 U.S.C. § 552 (FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 (enacted June 30, 2016)), and PA, 5 U.S.C. § 552a, stemming from requests for Criminal Division records. My duties include reviewing and processing files compiled by the Criminal Division in response to FOIA/PA requests to determine whether searches for records were properly conducted and decisions to withhold or release Criminal Division records were made in accordance with the FOIA and PA, as well as DOJ regulations at 28 C.F.R. §§ 16.1 *et seq.* If searches are incomplete and/or records have not been processed, I ensure that searches are completed. Then, I either process or oversee the processing of responsive records by FOIA/PA Unit staff members. I regularly consult with the Chief, Deputy Chief, and Associate Chief of the FOIA/PA Unit, Government Information Specialists, and other members of the Unit about the Criminal Division's processing of requests. I also consult with officials and employees in the Criminal Division sections where responsive records are located, and with other DOJ components and Executive Branch agencies that have equities in responsive records.

4. Due to the nature of my official duties, I am familiar with the procedures followed by the Criminal Division in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the PA, 5 U.S.C. § 552a. The statements that follow are made on the basis of my review of the Criminal Division's official files and records, my

personal knowledge, and on information I acquired in the course of performing my official duties in the FOIA/PA Unit.

**Plaintiff's FOIA Request, and the Criminal Division's Searches for Responsive Records**

5. On October 18, 2018, and November 15, 2018, the National Association of Criminal Defense Lawyers ("NACDL"), the named Plaintiff to this litigation, filed their Complaint and Amended Complaint, respectively in the United States District Court for the District of Columbia. See Docket ("Dkt.") Document ("Doc.") No's. 1 and 9. In their Amended Complaint, Plaintiff represented that on August 2, 2018, NACDL sent a FOIA request to the Criminal Division seeking the following agency records made on or after January 1, 2006:

> a. All guidance, directives, emails, or other communications sent to any U.S. Attorney's Office(s) regarding policies, practices, or procedures for requesting copies of inmates; attorney-client emails from the BOP.
>
> b. All guidance, directives, emails, or other communications sent to any U.S. Attorney's Office(s) regarding policies, practices, or procedures for requesting copies of inmates' emails from the BOP, including non-attorney-client emails.
>
> c. All legal or policy memoranda concerning any decision to enact or change DOJ policies, practices, or procedures for requesting inmates' emails from the BOP, including any policies, practices, or procedures for requesting that the BOP exclude from production any emails between an inmate and their attorney, as well as any policies, practices or procedures concerning the circumstances under which the government does not request such exclusions.

6. By letter dated August 24, 2018, the Criminal Division acknowledged receipt of Plaintiff's FOIA request, and informed Plaintiff that the Criminal Division was searching the sections most likely to contain responsive records, and that because Plaintiff's request presented "unusual circumstances," see 5 U.S.C. § 552(a)(6)(B)(i)-(iii)), the Criminal Division was extending the time to respond to the request beyond the 10-days provided by statute. The Criminal Division also assigned Plaintiff's FOIA request tracking number CRM-300677426.

7.      Based upon Plaintiff's FOIA request, the Criminal Division identified four (4) sections to search for potentially responsive records: (1) the Special Operations Unit ("SOU"), within the Office of Enforcement Operations ("OEO"); (2) the Computer Crimes and Intellectual Property Section ("CCIPS"); (3) the Electronic Surveillance Unit ("ESU"), within OEO, and (4) the OEO Director's Office. Searches of SOU, CCIPS, ESU and the OEO Director's Office were the most logical and reasonable places to search for responsive records. Within the seventeen sections of the Criminal Division, these units were those most likely to have some involvement or input related to issues of policy, coordination, and/or the monitoring of BOP inmate electronic messaging, communications and email.

**The Search of the Special Operations Unit ("SOU").**

8.      The FOIA/PA Unit sent its first search request to SOU on September 7, 2018. Based upon the results of that search request, on December 10, 2018, a follow-up search request was sent to the Criminal Division's Information and Technology Management ("ITM") section staff requesting ITM conduct a search using key terms and phrases of the Criminal Division's electronic database for certain identified and named SOU employees and/or record custodians. The data search was to be conducted on both the "H-Drive"[1] and/or "H-Directory," and the "S-Drive"[2] and/or "S-Directory." For purposes of this search, a total of fifteen (15) SOU employees and/or

---

[1] The H-Drive or H-Directory is an electronic database maintained by the Criminal Division's ITM section staff. The H-Drive or H-Directory allows each Criminal Division employee to store their own (non-shared) and individualized electronic case records, documents and other related information.

[2] The S-Drive or S-Directory is an electronic database also maintained by the Criminal Division's ITM section staff. The S-Drive or S-Directory allows employees working within a specified section or unit of the Criminal Division, in this instance, SOU, to store their electronic case records, documents and other related information which is then accessible by other employees within their section or unit.

record custodians were identified, and their electronic records were subsequently searched. The search terms used by ITM section staff were as follows: "Prisoner E-Mail OR prisoner computer access OR inmate E-mail OR inmate computer access." The dates of the search conducted by the ITM staff were as follows: "January 1, 2006 to December 10, 2018."

**The Search of the Computer Crimes and Intellectual Property Section ("CCIPS").**

9. On March 4, 2019, the FOIA/PA unit sent its first search request to CCIPS. Based upon the results of that search request, on March 8, 2019, a follow-up search request was sent to ITM section staff requesting ITM staff conduct a search using key terms and phrases of the Criminal Division's electronic databases for certain identified and named CCIPS employees/record custodians. The data search was to be conducted on both the H-Drive or H-Directory and the S-Drive or S-Directory. For purposes of this search, a total of seven (7) CCIPS employees and/or record custodians were identified, and their electronic records were subsequently searched. The search terms used by ITM section staff were as follows: "(prisoner! or inmate!"); ("2702 or 2703") and ("2702 or 2703 or subpoena or voluntary"). The dates of the search conducted by the ITM staff were as follows: "January 1, 2006 to the present ("March 2019")."

**The Searches of the Electronic Surveillance Unit ("ESU").**

10. On March 4, 2019, the FOIA/PA Unit sent an initial search request to ESU, which included a detailed description of the types of records being sought by Plaintiff. An ESU support staff employee with personal knowledge of ESU records conducted a search for responsive records, and potentially responsive records were located in a folder on ESU's S-Drive or S-Directory. On March 8, 2019, the FOIA/PA Unit sent a search request to ITM section staff requesting that a search be conducted of the ESU S-Drive or S-Directory. As a result of the earlier

5

ESU search, a folder had been identified and located which was entitled, "Special Projects." Within the Special Projects folder was another subfolder entitled, "Eck." ITM section staff was asked to retrieve and copy the complete subfolder and return the records to the FOIA/PA Unit.

**The Search of OEO's Directors Office.**

11. An ESU supervisory attorney further recommended to the FOIA/PA Unit that a search also be conducted of the OEO Director's Office. Based upon that recommendation, on March 6, 2019, the FOIA/PA Unit sent a search request to the OEO Director's Office. Based upon the results of that search request, on March 11, 2019, a follow-up search request was sent to ITM section staff to conduct a search using key terms an phrases of the Criminal Division's electronic database for any potentially responsive records of Mark Eckenwiler ("Eckenwiler"), a Former Associate Director of OEO. The data search was to be conducted on both the H-Drive or H-Directory and the S-Drive or S-Directory. For purposes of this search, Mr. Eckenwiler was identified as the employee/record custodian, and his electronic records were searched. The search terms used by ITM section staff were as follows: "Bureau of Prisons", "BOP", "inmate emails", "attorney-client emails", "Practice", "Policy", "Policies", "Procedures", "Directives", "Guidance", and "Stored Communications Act." The dates of the search conducted by the ITM staff were as follows: "January 1, 2006 to December 03, 2012."[3] As a result of ITM's search of the OEO Director's Office records, 2,868 electronic potentially responsive items were returned. As a result of the Criminal Division's overall search efforts in each of the following sections: SOU, CCIPS, ESU, the OEO Director's Office; a total of 527,488 pages of records were located and returned.

---

[3] The terminus date corresponds to the date Mr. Eckenwiler ended his employment at OEO.

**Plaintiff's Proposal to the Criminal Division to Narrow the Searches.**

12. Based upon the large volume of records returned as a result of the searches, on June 7, 2019, Plaintiff's legal counsel proposed to the Criminal Division that certain electronic search and connector terms be utilized for use in running a subsequent narrowing search. As a result of NACDL's narrowing proposal, the Criminal Division agreed to adopt NACDL's search terms and connectors *in toto*. The Criminal Division then proceeded to task ITM section staff to use the exact terms and connectors that NACDL had provided to the Criminal Division in order to narrow the searches which had already been conducted, and which had returned a large volume of potentially responsive electronic records. NACDL further agreed to narrow the scope of the search dates from January 1, 2008 to the present ("June 2019").

13. As a result of the ITM section staff search using NACDL's proposed search terms and connectors, ITM section staff returned three (3) separate categories of records: Search Category 1, resulted in the location of 1,845 items; which corresponds to approximately 2,389 pages of responsive records; Search Category 2, resulted in the location of 50,980 items, which corresponds to approximately 32,455 pages of responsive records, and Search Category 3, resulted in the location of 667 items; which corresponds to approximately 647 pages of responsive records. In each instance, before beginning to process the records, the documents were "de-duped" by the Government Information Specialist assigned to this matter, which resulted in an overall reduction in the initial high volume of pages returned as a result of the Criminal Division searches for responsive records.

**Responsive, Non-Exempt Information Disclosed – The First Interim Response Letter.**

14. On August 30, 2019, the Criminal Division sent its "First Interim Response" letter to Plaintiff. See Attachment 1. In its First Interim Response letter, the Criminal Division informed Plaintiff that with regard to the records in Search Category 3, a total of 647 pages of responsive records were returned as a result of the search. The Criminal Division reported that after having processed the records, 113 pages were deemed non-responsive; 400 pages were duplicative; two pages were suitable for release in full; three pages were being released in part, and fifty-six pages were exempt from disclosure, subject to the following Exemptions: (b)(5) the deliberative process privilege and the attorney client work-product privilege; (b)(6) and (b)(7)(C), the personal privacy provisions. In addition, the Criminal Division informed Plaintiff that it was referring fifty-five pages of records to the Executive Office of United States Attorneys ("EOUSA"), and eighteen pages of records to the Federal Bureau of Prisons ("BOP"), for direct response to (Plaintiff) requester. See Attachment 1.

**The Second Interim Response Letter.**

15  On September 24, 2019, the Criminal Division sent its "Second Interim Response" letter to Plaintiff. See Attachment 2. In its Second Interim Response letter the Criminal Division informed Plaintiff that it had completed processing of Search Category 1 and referenced 2,132 pages of records which were returned as a result of the search. The Criminal Division reported that after having processed the records, 122 pages were deemed non-responsive; 1,703 pages were duplicative; twenty-two pages were suitable for release in full; one page was suitable for release in part and 116 pages were exempt from disclosure subject to the following Exemptions: (b)(5) the deliberative process privilege and the attorney client work-product privilege; (b)(6) and (b)(7)(C), the personal privacy provisions. In addition, the Criminal Division reported to Plaintiff

that it had referred eighteen pages of records to EOUSA, and a further 150 pages of records to BOP, for direct response to (Plaintiff) requester. See Attachment 2.

**The Third Interim Response Letter.**

16. On December 31, 2019, the Criminal Division sent its "Third Interim Response" letter to Plaintiff. See Attachment 3. In its Third Interim Response letter the Criminal Division informed Plaintiff that it had completed processing of Search Category 2, and referenced 32,455 pages of records which were returned as a result of the search. The Criminal Division reported that after having processed the records, 30,740 pages were deemed non-responsive and 1,715 pages were duplicative of records located in Search Category 1, and Search Category 2. See Attachment 3.

17. On June 14, 2019, in connection with this matter, EOUSA made a referral of a ten (10) page document to the Criminal Division. The Criminal Division reviewed the document and deemed it to be non-responsive.

**Exempt Information Properly Withheld**

18. Attached to this declaration is the Criminal Division's *Vaughn* index containing a detailed description of the documents and records identified therein. The Criminal Division's *Vaughn* index further described as Documents Number One through Document Number Thirty-Four, which have either been released in full ("RIF"), withheld in full ("WIF"), and/or released in part ("RIP") to Plaintiff. The Criminal Division's *Vaughn* index contains the following designations: it describes the responsive documents at issue, including such information as the date of the record, the author and/or the recipient of the particular record, the general subject matter and/or the general content of the document. The Criminal Division's *Vaughn* index also

provides the number of pages for each respective record, and further identifies the applicable FOIA Exemptions which were asserted. See Attachment 4.

19. Documents Numbered One through Thirty-Four consist in their entirety of emails and/or email chains, some of which also contain attachments. In all instances where an email and/or an email chain has been identified as having an attachment, the attachments have either already been released in full (RIF) to Plaintiff, and/or referred to another federal agency for direct response to Plaintiff.

**Exemption (b)(5).**

20. The Criminal Division is withholding Documents Numbered One through Twenty-Two, and Documents Numbered Twenty-Four through Thirty-Three, as described in the Criminal Division's *Vaughn* index, pursuant to FOIA Exemption 5. Exemption 5 permits the withholding of "inter- or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." See 5 U.S.C. § 552(b)(5). Both the attorney work-product privilege and the deliberative process privilege, relied upon by the Criminal Division to withhold Documents Numbered One through Twenty-Two, and Documents Numbered Twenty-Four through Thirty-Three, fall within the ambit of a privilege against discovery covered by Exemption 5.

21. The attorney work-product doctrine protects tangible items prepared or developed by an attorney in anticipation of litigation such as interviews, memoranda and correspondence, and intangible items such as mental impressions, conclusions, opinions, personal beliefs or legal theories based upon the recognition that proper preparation of a case depends upon an attorneys' ability to assemble information, sort relevant from irrelevant facts, and prepare his/her legal

theories and strategies without intrusive or needless scrutiny. The courts have held that documents that provide tips on handling future litigation are also covered by the attorney work-product privilege. See *Hunt v. United States Marine Corps,* 935 F. Supp. 46, 53 (D.D.C. 1996).

22.     Moreover, "factual material is itself privileged when it appears within documents that are attorney work-product." *Judical Watch, Inc. v. Department of Justice*, 432 F.3d 366, 371 (D.C. 2005) citing *Tax Analysts v IRS*, 117 F.3d 607, 620 (D.C. Cir. 1987), where the Circuit Court of the District of Columbia held that "[a]ny part of a document prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under Exemption 5 . . . In other words, factual material is itself privileged when it appears within documents that are attorney work product. If a document is fully protected as attorney work product, then segregability is not required."

23.     To qualify for the deliberative process privilege, an agency record must be both pre-decisional and deliberative. The deliberative process privilege protects the quality of agency decision-making by permitting open and frank discussion between subordinates and superiors, protecting against premature disclosure of proposed policies, and protecting against the public confusion that might result for disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. See, e.g., *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 772-773 (D.C. Cir. 1978) (*en banc*); *Miller*, 872 F. Supp. 2d at 24.

24.     The records withheld here on the basis of Exemption 5 consist of emails and email chains which discuss the subject of BOP's policy pertaining to the practice of permitting inmates' access to email communications. The emails and email chains discuss subjects such as any applicable statutory and/or case law related to the issue of how a federal prosecutor would proceed in order to obtain BOP inmate email communications for purposes of conducting an

underlying investigation and/or prosecution; there are also queries and discussions about what, if any, potential impact the BOP inmate email communication program might have on certain programs operated by OEO's Special Operations Unit ("SOU"). In these instances, the inquiry was solely focused on whether the BOP inmate email communication would have any impact upon the Special Administrative Measures ("SAM's") program as operated by SOU. Typically, the emails and email chains, involve discussions by and between Trial Attorneys within CCIPS and SOU, and a "Former" Assistant Director of OEO, and at times, also include both AUSAs' and BOP Agency Counsel located in various field offices throughout the country. Thus, the Exemption 5, inter/intra agency threshold has been met.

25.     The email and email chain records were prepared by or at the direction of an attorney, in this case either CCIPS and/or SOU Trial Attorneys', a "Former" Assistant Director of OEO, AUSAs' and BOP Agency Counsel in anticipation of the possibility of litigation related to the subject of obtaining BOP inmate email communications in connection with an underlying federal criminal investigation and/or subsequent prosecution. The email and email chain records were also prepared by or at the direction of an attorney, in this instance, SOU Trial Attorneys who were queried, and asked to assess the possible impact, if any, of BOP's policy of allowing inmates email communication privileges, and what effect, if any, it might have on the SAM's program, as presently operated by SOU.

26.     The Criminal Division determined that these records are protected by the attorney work-product privilege because they contain information constituting the legal and statutory analysis of CCIPS Trial Attorneys', a "Former" Assistant Director of OEO, and AUSAs' and BOP Agency Counsel, and details their analysis of the legal ramifications of employing certain methods of obtaining and using BOP inmate email communications, in connection with an

underlying federal criminal investigation and/or prosecution. Because public release of this information would inhibit essential investigative and decision-making processes, the Criminal Division withheld this material to protect against disclosing the thought processes of the CCIPS Trial Attorneys', a "Former" Assistant Director of OEO, as well as AUSAs' and BOP Agency Counsel, which would further reveal their specific strategies, methods and tactics, in connection with the procedures for obtaining BOP inmate email communications, and their use in any subsequent federal criminal investigation and/or prosecution.

27. The email and email chain records are protected by the deliberative process privilege because they are both pre-decisional and deliberative. First, the email and email chain records contain information gathered by CCIPS Trial Attorneys', a "Former" Assistant Director of OEO, AUSAs' and BOP Agency Counsel, who in the course of making an assessment or determination about the process a federal prosecutor should follow in order to obtain BOP inmate email communications in connection with an ongoing investigation and/or criminal prosecution. Second, the emails and email chain records reflect the deliberations of the CCIPS Trial Attorneys', a "Former" Assistant Director of OEO, AUSAs' and BOP Agency Counsel about legal issues, including the existence of any applicable statutory and/or case law, which a federal prosecutor such as an AUSA, would be expected and/or required to comply with in order to obtain such BOP records. The information contained in the email and email chain records expresses the author's opinions, and further contains discussions regarding various factual scenarios and the legal basis for choosing specific strategies to be employed in order to obtain BOP inmate email communications. Release of this information could have a chilling effect on frank and open discussions by CCIPS Trial Attorneys', a "Former" Assistant Director of OEO, AUSAs' and BOP Agency Counsel, and undermine law enforcement efforts to maintain their

concern for ensuring the overall safety and security of federal penal institutions, as well as their respective inmate populations and support staff.

**The Foreseeable-Harm Requirement.**

28.     The foreseeable-harm requirement began not as a creation of the Legislative Branch, but of the Executive.[4] Upon assuming office in 2009, then-President Barrack Obama issued direction to Executive Branch agencies on implementation of FOIA. Shortly thereafter, then-Attorney General Eric Holder implemented the President's directive by establishing the foreseeable harm requirement. See Memorandum from Eric Holder, Attorney Gen., U.S. Dep't of Justice, to Heads of Exec. Dep't & Agencies (March 19, 2009), https://www.justice.gov/sites/default/files/ag/legacy/2009/0624/foia-memo-march 2009.pdf. In his memorandum to Executive Branch agencies, Attorney General Holder explained that to "realize[ ]" the presumption of openness" "in practice," "an agency should not withhold information simply because it may so legally" or "merely because it can demonstrate, as a technical matter, that the records fall within the scope of a FOIA exemption. *Id*., at 1. Rather the Department of Justice would now "defend a denial of a FOIA request only if (1) the agency reasonably fores[aw] that disclosure would harm an interest protected by one [FOIA's] statutory exemptions, or (2) disclosure [was] prohibited by law. *Id*., at 2. Congress decided to make the "presumption of openness" established by the Presidential Memorandum in 2009 "a permanent requirement for agencies with respect to FOIA." *Id*., at 9; see also S. REP. NO. 114-4, at 7.

29.     In order to establish foreseeable-harm, defendant must provide "context or insight

---

[4] *Center for Investigative Reporting v. U.S. Customs and Border Protection and U.S. Dep't of Homeland Security*, 436 F. Supp. 3d. 90, 104-106 (D.D.C. 2019) (The *Center for Investigative Reporting* decision contains an excellent overview and discussion of the foreseeable-harm requirement).

into the specific decision-making process or deliberations at issue, and how they in particular would be harmed by disclosure." *Center for Investigative Reporting v. U.S. Customs and Border Protection and U.S. Dep't of Homeland Security*, 436 F. Supp. 3d. 90, 107 (D.D.C. 2019) citing *Judicial Watch, Inc. v. Dep't of Justice*, (Judicial Watch II), 2019 WL 4644029, at *5, see also *NRDC v. EPA*, 2019 WL 4142735 at *5 (S.D.N.Y., Aug. 30, 2019) (finding foreseeable-harm requirement satisfied where agency gave "context for the decision making processes in question and the harms that would reasonably ensue from disclosure of the material.").

30. It is imperative that federal prosecutors must be able to freely and openly discuss and formulate strategies and best practices for obtaining access to BOP inmate email communications. The environment of a federal correctional facility is by its very nature, restrictive. Rules and regulations are required to maintain a modicum of order, safety and security throughout these institutions. Such rules and regulations are designed and promulgated to ensure the safety and security of the institution from both internal and external threat, and further to protect the lives of those persons who are incarcerated, and/or employed therein. It is also well established that access to contraband items such as narcotics and weapons can be coordinated and facilitated through inmate access to and use of email communications. It is further conceivable that an inmate with access to email communications could, if unmonitored, and left alone to his/her own devices, coordinate the delivery or introduction of contraband, and/or even formulate escape plans with persons residing outside of the institution. Due to the nature of these types of extant internal and external computer threats, federal prosecutors, including AUSAs most likely to be tasked with conducting the underlying investigations and prosecutions, must be able to discuss in an unfettered fashion the various factual scenarios, as well as the legal basis for choosing and developing specific strategies for obtaining access to

BOP inmate email communications. Based upon the foregoing, the foreseeable-harm requirement has been met.

**Exemption (b)(7) Threshold.**

31. Exemption (b)(7) of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in the subpart of the exemption. See 5 U.S.C. § 552(b)(7). In this case, the harm that could reasonably be expected to result from disclosure concerns invasion of personal privacy (b)(7)(C).

32. Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Law enforcement agencies such as the Criminal Division must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duties of that agency. Documents responsive to the Plaintiff's FOIA request relate to third-party individuals, lower-level DOJ employees, AUSAs and BOP agency counsel. Accordingly, the information at issue readily meets the threshold requirement of Exemption (b)(7).

**Exemption (b)(6) – Clearly Unwarranted Invasion of Personal Privacy and Exemption (b)(7)(C) – Unwarranted Invasion of Personal Privacy.**

33. U.S.C. § 552(b)(6) exempts from disclosure "personnel and medical files and similar files" when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy. Similarly, 5 U.S.C. § 552(b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute

16

an unwarranted invasion of personal privacy.[5]

34.  When withholding information pursuant to these exemptions, the Criminal Division is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. In asserting this exemption, the Criminal Division has scrutinized each item of information to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue. In conducting this analysis, the public interest in disclosure of this information is determined by whether the information in question would shed light on DOJ's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. In this case, the Criminal Division concluded that the information should be withheld under Exemptions (b)(6) and (b)(7)(C), and determined that the individuals' privacy interests were not outweighed by any public interest in disclosure. To reveal the names and/or identifying information of third-party individuals in the context of records pertaining to such third-party individuals and lower-level government employees could reasonably be expected to cause harassment, embarrassment and/or unsolicited publicity which would clearly constitute an unwarranted invasion of their personal privacy.

35.  Information withheld by the FOIA/PA Unit pursuant to Exemptions (b)(6) and

---

[5] The practice of the Criminal Division's FOIA/PA Unit is to assert Exemption (b)(6) in conjunction with Exemption (b)(7)(C). Although the balancing test for (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" and the test for (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

(b)(7)(C) consist of: the names of third-party individuals, lower-level DOJ employees and support staff, AUSAs, and BOP agency counsel. As to third-part individuals, names, work email addresses, personal cell phone numbers, office numbers, and other identifying information, were protected.  Accordingly, the Criminal Division concluded that disclosure of this information would constitute a clearly unwarranted invasion of their personal privacy with Exemption (b)(6), and could reasonably be expected to constitute an unwarranted invasion of personal privacy with Exemption (b)(7)(C). The Criminal Division properly withheld the names and identifying information of third-party individuals and lower-level DOJ government employees pursuant to Exemptions (b)(6) and (b)(7)(C).

36. FOIA Exemption (b)(7)(C) protects personal information in criminal law enforcement records whose disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy. Individuals – whether targets, suspects, or witnesses – have a strong interest in not being unfairly associated publicly with alleged criminal activity. The mention of a private individual's name in a law enforcement file engenders comment and speculation and could produce an unfair stigma which could expose the individual to harassment or criticism. Similarly, public identification of law enforcement personnel, prosecutors, and the non-supervisory officials involved in the Criminal Division's internal review process could subject them to harassment both in the conduct of their official duties and their private lives. Accordingly, the Criminal Division has recognized that these individuals also have a substantial privacy interest in avoiding disclosure of their personal information in the requested documents.

37. The FOIA requires that, once a substantial privacy interest has been identified, it must be balanced against the magnitude of any recognized public interest that would be served by the disclosure. Plaintiff has not identified a recognized public interest, and the Criminal

Division is not aware of any. The proper focus of the balancing process is the nature of the requested documents and their relationship to the statutory purpose to open agency action to the light of public scrutiny. The Criminal Division determined that the privacy interests of the third-party individuals and DOJ lower-level support staff was substantial. The Criminal Division has not identified any cognizable public interest in the disclosure of this information. Release of information involving the personal details of individuals, would not add to the public's understanding of how the Criminal Division works or how well the Criminal Division performs its statutory duties. Accordingly, the Criminal Division concluded that, on balance, the individuals' privacy interests substantially outweighed any purported public interest in the disclosure of the information.

38. The Criminal Division is also withholding third-party information contained in Documents Numbered One through Thirty-Four because the disclosure of that information would constitute a clearly unwarranted invasion of the personal privacy of individuals.

39. FOIA Exemption (b)(6) protects information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." As a threshold matter, Criminal Division records containing the protected information constitute "similar files" within the meaning of FOIA Exemption (b)(6) because they pertain to particular individuals, *i.e.*, the law enforcement personnel involved in ensuring that the BOP inmate email program is not able to undermine law enforcement efforts to maintain their ongoing concern of maintaining the overall safety and security of federal penal institutions, as well as their respective inmate populations and support staff.

40. As explained in paragraph 34 above concerning the balancing process, there is no substantial public interest in the disclosure of the information the Plaintiff is seeking. As a result, there is no public interest to be balanced against the important privacy interests of individuals. Accordingly, public access to personal information about the individuals described above would violate their substantial privacy interest in controlling information concerning their persons.

## CONCLUSION

41. As discussed above, the Criminal Division has searched for and processed all responsive records relevant to the Plaintiff's FOIA requests. The Criminal Division has reviewed all of these records and determined that there are no reasonably segregable non-exempt portions that can be released. The Criminal Division's *Vaughn* index, see Attachment 4, describes the relevant information contained within the responsive records, as well as the Defendant's basis for the invoked FOIA Exemptions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of October 2020.

_____
John E. Cunningham III