**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>FEDERAL BUREAU OF PRISONS, *et al.*,<br><br>　　　　　　　Defendants. | Case No. 18-cv-2399 (JMC) |

## <u>MEMORANDUM OPINION AND ORDER</u>

The National Association of Criminal Defense Lawyers (NACDL) requested information from several agencies about federal prosecutors' ability to access emails sent and received by people incarcerated in federal prisons. The agencies produced some records responsive to that request and withheld others under various exemptions to the Freedom of Information Act. Now both parties move for summary judgment, principally contesting the adequacy of the Government's search for records and the propriety of its withholding of certain records. The Court **GRANTS** each motion in part and **DENIES** each motion in part.

The Court grants summary judgment to the Government on the adequacy of its search except for the searches it conducted in the Eastern District of Pennsylvania and the Eastern District of Michigan. The Court denies the Government's motion for summary judgment as to those two offices. Because the Government has inadequately described the searches conducted in those offices, it must come forward with additional information about those searches.

As for the Government's withholding of documents under various exemptions, the Court grants its motion in part, denies it in part, and does the same for NACDL's motion. Both motions are denied as to the withholding under Exemption 4 of the Act—the Government must supplement

1

the record before the Court can determine the applicability of that exemption. The Court grants summary judgment to the Government as to its withholdings under Exemption 7. The Court likewise grants summary judgment to the Government for its withholdings under the deliberative process privilege and work product doctrine with the following exceptions:

- The Court denies the Government's motion and grants NACDL's motion as to Criminal Division records 3 and 4 and BOP record j, and orders the Government to produce those records;

- The Court denies without prejudice both motions as to Criminal Division record 22 and EOUSA records 11 and 21.

Finally, the Government's motion is denied without prejudice as it relates to the withholding of certain documents that were inadequately described in the *Vaughn* indexes and declarations. The Court likewise denies without prejudice the Government's motion as it relates to its compliance with its obligation to produce all reasonably segregable material. But the Court denies NACDL's motion insofar as it claims the Government unlawfully withheld nonresponsive materials.[1]

## I.     BACKGROUND

People incarcerated in federal prisons "have access to an email system called TRULINCS." ECF 42 ¶ 3. "To use TRULINCS," these people "are required to click an agreement stating that their communications—including messages to or from their attorneys—will be monitored and that communications with their counsel will not be treated as privileged." *Id.* ¶ 4.

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

Hoping "to inform the public about the extent to which United States Attorneys' Offices obtain attorney-client emails," the "preeminent organization" of defense attorneys in the United States—the National Association of Criminal Defense Lawyers—submitted a request under the Freedom of Information Act "for records concerning federal prosecutors' access to emails." ECF 42-2 at 2–3 & n.1. The group requested information from the Bureau of Prisons (BOP), three divisions within the Department of Justice—the Criminal Division, Office of Information Policy, and Office of Legal Counsel—and the Executive Office for the United States Attorneys (EOUSA). *See* ECF 42-2 (BOP request); ECF 42-3 (DOJ request); ECF 42-4 (EOUSA request). In its request to EOUSA, the organization asked for information from 27 different United States Attorneys' Offices throughout the country. *See* ECF 42-4 at 4. Those offices are all "under the purview of EOUSA," so EOUSA "tasked" them with searching for records after it received the request. ECF 53-2 ¶¶ 4, 21; ECF 55-5 ¶¶ 4, 21.

Unsatisfied with the Government's initial failure to produce any records, NACDL filed this lawsuit. *See* ECF 1. The parties then engaged in more than a year and a half of negotiations, during which time the Government handed over some records. ECF 53-2 ¶¶ 10–12, 16–18, 24–26; ECF 55-5 ¶¶ 10–12, 14–18, 22–26; *see also* ECF 40 ¶ 2 (fifteenth joint status report). But because those negotiations did not entirely resolve the dispute about the adequacy of the Government's response to NACDL's request, the then-presiding district judge set a briefing schedule. June 30, 2020 Min. Order. NACDL then filed its second amended complaint, in which it explained that it was unsatisfied with various aspects of the Government's search for records and its withholding of records under certain exemptions to the Freedom of Information Act. ECF 42. The Government answered, ECF 43, and the parties filed cross motions for summary judgment. *See* ECF 53, 55. After those motions were fully briefed, the case was reassigned to this Court.

## II.    LEGAL STANDARD

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). "The agency is entitled to summary judgment only if it shows beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Aguiar v. DEA*, 865 F.3d 730, 738 (D.C. Cir. 2017). Likewise, an "agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of claimed exemptions." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). Nonetheless, "[w]here the FOIA requester responds to the government's motion for summary judgment without taking issue with the government's decision to withhold or to redact specific documents, the Court can reasonably infer that the … requester does not seek those specific records or information." *Shapiro v. DOJ*, 239 F. Supp. 3d 100, 106 n.1 (D.D.C. 2017).

## III.    ANALYSIS

NACDL's challenges to the Government's production of records largely fall within two categories. The first set of arguments relate to the adequacy of the Government's search for records. In its complaint, NACDL brings a claim because of EOUSA's—and only EOUSA's—alleged "failure to establish the adequacy of its search." ECF 42 ¶ 48. The Government has moved for summary judgment on that claim, and in response NACDL has focused its objection on a subset of EOUSA's search: the "searches run in [the] District of Arizona, Northern District of Illinois, Eastern District of Michigan, Southern District of New York, [and] Eastern District of Pennsylvania," along with "EOUSA's processing of responsive records" from specific United States Attorneys' Offices. ECF 58 at 6. The Court concludes that the Government has demonstrated that it conducted adequate searches in every office except the Eastern District of

Pennsylvania and Eastern District of Michigan, so grants summary judgment to the Government on this claim except insofar as it relates to those two offices.

The second bundle of claims NACDL brings relate to the Government's invocation of various exemptions under which it refused to hand over certain records. NACDL claims that the Government has not justified a handful of its withholdings under Exemptions 4, 5, and 7. *See* ECF 58 at 6.[2] The Government and NACDL have both moved for summary judgment as to those withholdings, and the Court grants each of their motions in part. The Court concludes that the Government has adequately justified its withholding of many of these records so grants summary judgment to the Government on those records. Other records, however, are not subject to the claimed exemptions. The Court grants summary judgment to NACDL as to those records and orders the Government to produce them. For a third group of records, the factual record does not allow the Court to determine whether they are or are not subject to the claimed exemption. As to those records, the Court denies summary judgment to both parties without prejudice and will allow the parties to come forward with further evidence and renewed motions should they not otherwise resolve this case.

Finally, NACDL raises a handful of other issues related to the Government's evidentiary showing on summary judgment and to its withholding of records. The Court concludes that NACDL has identified issues with the Government's description of certain withheld records so denies summary judgment to the Government as to those records. Likewise, the Court denies summary judgment to the Government as to the adequacy of its segregability analysis. On the flip

---

[2] In its reply in support of its motion for summary judgment, NACDL made clear that it was no longer seeking summary judgment as to the Government's withholding of several documents that NACDL had challenged in its initial motion. *See* ECF 58 at 6. Because NACDL no longer "seek[s] to compel the release of the[se] withheld" documents "there is … no dispute to resolve" about them. *Shapiro*, 239 F. Supp. 3d at 106 n.1.

side, the Court denies NACDL's motion insofar as it seeks to compel the Government to produce certain records that were initially identified as nonresponsive.

## A. The adequacy of the Government's search

The arguments NACDL makes about the adequacy of the Government's search are trained entirely on the search conducted by EOUSA and a handful of the U.S. Attorneys' Offices under its purview. *See* ECF 54 at 16–27. NACDL does not object to any aspect of the Bureau of Prison's or the Department of Justice components' searches. Further narrowing the issues, in its reply NACDL abandoned several of its arguments about the adequacy of the search. *See* ECF 58 at 6. The remaining contested issues relate only to the searches done by EOUSA itself, along with the U.S. Attorneys' Offices in the Eastern District of Pennsylvania, the District of Arizona, the Eastern District of Michigan, the Southern District of New York, and the Northern District of Illinois. *See id.* Across those offices, NACDL's arguments relate either to (1) the adequacy of the evidence the Government has put forward to explain its search or (2) the adequacy of the search itself. The Court grants summary judgment to the Government except as to the searches in the Eastern District of Pennsylvania and Eastern District of Michigan. The Government must offer a more detailed description of the searches conducted in those offices or, if necessary, conduct further searches.

### 1. Eastern District of Pennsylvania

The Government can meet its burden of demonstrating "a good faith effort to conduct a search … using methods which can be reasonably expected to produce the information requested … by submitting a reasonably detailed affidavit setting forth the search terms and the type of search performed." *Reps. Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017). NACDL argues that the Government has not done that when it comes to the Eastern District of Pennsylvania because it failed to "provide [an] adequate description[]" of that office's search.

ECF 54 at 18. NACDL is right. The affidavit outlining the Eastern District's search does little more than "describe[] ... the agency employees to whom the search was assigned, why they were chosen, and what they found." *Aguiar*, 865 F.3d at 738. That falls short.

The declaration filed by the person responsible for FOIA requests in the Eastern District explains that the office's criminal chief, criminal appeals chief, and other chiefs "did a search" which "revealed one document." ECF 53-3 at 52. While she does identify where they searched— the office's "Sharepoint Page," its "Criminal Division Manual," and the criminal appeals chief's "computer," *id.*—she does not say anything about "the manner in which the ... search" of those locations was "conducted." *Weisberg v. DOJ*, 627 F.2d 365, 370 n.49 (D.C. Cir. 1980).

Tellingly, after that initial search EOUSA asked the Eastern District for "a description of the search terms, connectors, and systems" the office "used in its search." ECF 53-3 at 53. While the declarant says that the office "responded" to that request, she is silent as to how they answered the question asked, and the fact that EOUSA then "request[ed] a supplemental email search based on 'word searches,' i.e., 'BOP' or [']Bureau of Prisons,' 'inmate,' 'Consent to Monitor Agreement,' or 'inmate within 20 words of email,'" strongly suggests that the office had not previously done a search using terms like those ones. *Id.* Yet, despite EOUSA's request, the declaration does not say that the Eastern District of Pennsylvania ever *did* the supplemental search EOUSA requested using those search terms. Instead, it says only that the declarant "sought the guidance of" the appeals chief, "who was confident EDPA had no additional records," and that the declarant then "again advised"—it's not clear in the declaration who she "advised"—"that the Chief of the Criminal Division and the Chief of Appeals (who has been in this position for over 20 years) searched their paper (Criminal Division Manual) and electronic files including mails and SharePoint." *Id.* The declaration then concludes that the office "confirmed that no other

memorandum regarding policies and or procedures for obtaining prisoner emails exist" and that "[n]o other searches are needed because we are confident that no office policy apart from the" one it had already identified "was promulgated." *Id.*

Not only does the declaration not aver that the office ever conducted the supplemental search EOUSA requested, then: It could plausibly be read to say that the office made a conscious decision not to conduct that search. A declarant from EOUSA does elsewhere testify that "[e]ach" U.S. Attorneys' Office "used search terms" and that the Eastern District of Pennsylvania specifically "provided the search terms [it] used." ECF 56-1 at 3 & n.4 But in making that claim about the Eastern District, EOUSA's declarant cites paragraphs of the Eastern District's declaration that do not actually "provide[] the search terms used." *Compare id.* (citing paragraphs 11, 16, and 18), *with* ECF 53-3 at 52–53 (paragraphs 11, 16, and 18 do not list any search terms used, but instead only include the search terms EOUSA asked the Eastern District to use).

The complete lack of clarity or specificity in the declaration about "how" the Eastern District of Pennsylvania "searched within [its] files" for responsive records forecloses it from making the requisite showing that it, "beyond material doubt," "conducted a search reasonably calculated to uncover all relevant documents." *Aguiar*, 865 F.3d at 738. To be sure, there is no "categorical" requirement that an agency use "search terms" to conduct a sufficiently rigorous search. *Dahlstrom v. U.S. Dep't of Homeland Sec.*, No. 22-cv-1165, 2025 WL 2840264, at *4 (D.D.C. Oct. 7, 2025). But the Government cannot meet its "summary-judgment burden" by filing "an affidavit containing no information about the search strategies" it employed. *Reps. Comm.*, 877 F.3d at 403. So although the Eastern District of Pennsylvania may have conducted an adequate

search even if it did not use search terms, it has not demonstrated that on this record. The Court therefore denies summary judgment to the Government on the adequacy of this search.[3]

### 2. District of Arizona

As with the Eastern District of Pennsylvania, NACDL argues that the District of Arizona "provide[d] only [a] cursory description[]" of its search. ECF 54 at 18. Unlike the Eastern District of Pennsylvania, however, the declaration that describes the search conducted in the District of Arizona is sufficiently detailed.

That declaration—filed by the civil chief for the district—explains that NACDL's request was "circulated to at least 19 Assistant United States Attorneys" within the office, including the civil chief, "the two criminal division chiefs[,] and unit chiefs." ECF 53-3 at 31. The civil chief "examined all written Department of Justice and" U.S. Attorney's Office for the District of Arizona "policies, memoranda[,] and guidance" available on the "Department of Justice intranet site and on the" U.S. Attorney's "intranet site." *Id.* He also "searched [his] archived email using key words such as 'prisoner email,' 'Bureau of Prisons email,' 'inmate email,' [and] 'BOP email.'" *Id.* The criminal division chiefs conducted similar searches and "conferred with [Assistant United States Attorneys] within their supervisory chain to determine whether potentially responsive records might exist." *Id.* at 31–32. After that search, a supplemental search was done at EOUSA's request. *See id.* at 32. In that search, "several [Assistant United States Attorneys], including

---

[3] Because the Court holds that the Eastern District's affidavit is insufficiently detailed, the Court does not reach the other arguments NACDL makes about the Eastern District's search. The Government might resolve those issues either by filing a more detailed declaration or conducting a supplemental search. *See, e.g., Aguiar*, 865 F.3d at 739 (noting that if an agency conducted an adequate search it "can say so in a new declaration"); *Parker v. DOJ*, 68 F. Supp. 3d 218, 222 (D.D.C. 2014) (remanding to agency to "conduct an adequate search"). The Court notes, however, that NACDL has flagged an inconsistency in the Eastern District's declaration that the Government could helpfully resolve in a supplemental filing. As NACDL points out, the Eastern District's declaration twice states that the office found "only" "one" responsive document. ECF 53-3 at 52–53. As NACDL also points out, however, the *Vaughn* index indicates that three responsive records were located in the Eastern District of Pennsylvania. *See* ECF 53-4 at 1, 4, 6 (documents 2, 8, and 14). In a supplemental declaration EOUSA did try to explain this discrepancy, *see* ECF 56-1 at 3 n.4, but the Court finds that explanation something less than a model of clarity and does not understand whether the Eastern District or EOUSA located these documents or when and how the documents were located.

division and section chiefs, search[ed] their email folders, including archived emails, using" the same "key words" that the civil chief used in his search. *Id.* Contrary to NACDL's claim that the District of Arizona "failed to detail [its] method of searching," ECF 54 at 20, the declaration includes ample information about "the search strategies" used, *Reps. Comm.*, 877 F.3d at 403. Nothing more is required.

In addition to its argument about the adequacy of the District of Arizona's description of its search, NACDL also argues that the search the district conducted was unreasonably narrow in its scope. *See* ECF 54 at 25. As NACDL sees it, the organization requested "all records, external guidance, and legal or policy memoranda regarding policies, practices, or procedures for requesting copies of inmates' emails from the BOP," but the District of Arizona "improperly" searched only for "written policies." *Id.* That argument both misreads the district's declaration and flounders on its own terms.

The declaration first. Sure enough, the declarant uses the word "written" to describe the records the office searched for. But NACDL's suggestion that in doing so the declaration reveals that the office improperly failed to search for "informal practices and procedures," ECF 54 at 25, ignores the context in which that word is used. The district's civil chief explains that attorneys in the office looked for all "written … policies, memoranda[,] and guidance." ECF 53-3 at 31. He then reiterates that, in its supplemental search, the office looked for "all written … policies and procedures in electronic and written form." *Id.* at 32. In searching for "policies, memoranda[,] and guidance," the office went looking for precisely the categories of information NACDL sought. *See* ECF 53-3 at 14. And given that the office looked for records in "electronic and written form" and searched in "email folders" as well as "intranet site[s]," ECF 53-3 at 31–32, there is no reason to think the search was tailored to discover only "[]formal" records. *Contra* ECF 54 at 25.

Nor is it clear how searching only for "written" records could have meaningfully limited the scope of the office's search, given that the only responsive records that were likely to exist were written ones. If this were a case where it seemed plausible that the Government would maintain non-"written" records of policies, practices, or procedures—audio recordings, videos, or photographs come to mind—the declarant's use of the word "written" could give the Court pause. But NACDL has not argued, and the Court does not believe, this is such a case. And although the Court can imagine that some practices are passed orally from attorney to attorney, if those bits of institutional knowledge have not been memorialized into some form of record the Government "cannot be compelled to create" such a record for purposes of responding to a FOIA request. *Krohn v. DOJ*, 628 F.2d 195, 198 (D.C. Cir. 1980). There is therefore nothing to NACDL's argument that by searching only for "written" records the office inappropriately limited the scope of its search. Because the Government conducted an adequate search in the District of Arizona, the Court grants its motion for summary judgment as to this search.

### 3. The Eastern District of Michigan

NACDL complains both about the declaration filed by the Eastern District of Michigan and about the scope of the search that office conducted. Some of its arguments about the declaration have merit, so the Court denies summary judgment to the Government as to the search in this United States Attorney's Office.

As for the declaration, NACDL points to what it says are inconsistencies between the office's declaration and the *Vaughn* index.[4] *See* ECF 54 at 21–22. One of the supposed inconsistencies the organization identifies is numerical. As NACDL reads the declaration filed by

---

[4] A *Vaughn* index is a document created by the agency that includes a "description of each document" it "withheld or redacted and an explanation of the reasons for non-disclosure." *Judicial Watch, Inc. v. USPS*, 297 F. Supp. 2d 252, 257 (D.D.C. 2004). The Government filed three *Vaughn* indexes, one for EOUSA, another for the Bureau of Prisons, and a third for the Department of Justice's Criminal Division. *See* ECF 53-4; ECF 53-6; ECF 53-8.

the FOIA coordinator in the Eastern District of Michigan, that office "identified only two potentially responsive records." *Id.* at 21. But in the *Vaughn* index, EOUSA describes three records as coming from the Eastern District of Michigan. *See id.* at 21–22 (citing EOUSA *Vaughn* index records 1, 5, and 16).

NACDL is right that discrepancies of this kind can preclude the grant of summary judgment to an agency because they raise questions about the agency's search. *See, e.g.*, *Pinson v. DOJ*, 313 F. Supp. 3d 122, 127–28 (D.D.C. 2018). The Court, however, disagrees with NACDL's suggestion that there is a numerical mismatch. The declaration explains that two First Assistant United States Attorneys both found potentially responsive records while conducting their searches. *See* ECF 53-3 at 39. It goes on to describe one of the records that one of those attorneys found. *See id.* It never says, however, that this record was the only one located by the Eastern District of Michigan. Instead, it says that the record was "included" in what the Eastern District handed over to EOUSA as potentially responsive. *Id.* And as EOUSA explained elsewhere, the Eastern District "did not describe in its declaration each document it provided to EOUSA." ECF 56-1 at 3 n.2. So nothing in the Eastern District's declaration suggests it *only* located two responsive documents, which resolves this would-be discrepancy.

Nonetheless, NACDL also identifies another discrepancy between the Eastern District's declaration and the *Vaughn* index that cannot be so easily explained. The declaration says that one of the responsive records found in the office was a May 4, 2009, email from an Assistant United States Attorney in the office that was accompanied by two attachments. *See* ECF 53-3 at 39. None of the three records that the *Vaughn* index says originated in the Eastern District of Michigan, however, match that description. Those records are dated from 2018 or 2019. *See* ECF 53-4 at 1, 3, 16 (documents numbered 1, 5, and 16). There is one record on the *Vaughn* index that was created

on May 4, 2009, and was sent from one Assistant United States Attorney to another. *See* ECF 53-4 at 8 (document 20). But the description of that document says it came from the Western District of Washington, not the Eastern District of Michigan. *See id.*

Perhaps the Government made a typographical error on the *Vaughn* index and the record it says is from the Western District of Washington is actually the responsive record described in the Eastern District of Michigan's declaration. But "the Court cannot substitute guesswork for an explanation from the agency," and neither the *Vaughn* index nor any declaration currently before the Court "address whether [EOUSA] processed and accounted for" the record discussed in the Eastern District of Michigan's declaration. *Sarras v. DOJ*, No. 19-cv-0861, 2023 WL 6294164, at *12 (D.D.C. Sept. 27, 2023); *Plunkett v. DOJ*, No. 11-cv-0341, 2015 WL 5159489, at *10 (D.D.C. Sept. 1, 2015). Rather than speculate, the Court leaves it to the Government to come forward with an explanation for the apparent "contradict[ion]" in its "account of the search." *Kim v. U.S. Dep't of the Interior*, 859 F. Supp. 2d 13, 18 (D.D.C. 2012).

Turning next to NACDL's complaint about the adequacy of the Eastern District of Michigan's search, that objection is belied by the record. NACDL argued in its cross-motion for summary judgment that the office's search was too narrow because it used the search term "Consent to Monitoring Agreement," but did not search using more "colloquial[]" terms that are used to describe the email "monitoring policy." ECF 54 at 23. In its response, the Government pointed out that the Eastern District of Michigan used many other search terms. *See* ECF 56 at 10. NACDL then filed its reply, claiming that the Government misunderstood its argument: "NACDL did not mean to imply that" the Eastern District of Michigan "*only* used … inappropriately narrow terms during [its] search," but instead that this term was used to "uncover[] certain relevant records" yet was too restrictive to uncover all responsive records. ECF 58 at 13.

13

The Court understood NACDL's argument in the opening brief in the same way that the Government did, but whatever the organization meant to say, the argument fails even as clarified in the reply. NACDL suggests that this inappropriately narrow search term was oriented towards finding records that used terms like "inmate emails." ECF 54 at 23–24; *see also* ECF 58 at 13 (NACDL explaining this argument). But the Eastern District of Michigan searched using the term "inmate emails," ECF 53-3 at 39–40, while also searching with other terms akin to those NACDL argues were appropriate, *compare id.* at 38 (search includes words "inmates' attorney client emails"), *with* ECF 54 at 23 (identifying terms like "prisoner emails" and "email access").

This is therefore not a case where the agency failed to use in its search "obvious alternative terms for the subject matter" requested. *Am. Oversight v. U.S. Dep't of Health & Human Servs.*, 101 F.4th 909, 924 (D.C. Cir. 2024). Instead, the Eastern District used terms that closely tracked the language of NACDL's request and that were "reasonably calculated to uncover all relevant documents." *Id.* at 923; *compare* ECF 53-3 at 38–40 (office searched for "policies, practices or procedures to request inmates' attorney client emails from the Bureau of Prisons," as well as "inmate emails" and a series of Boolean terms including "BOP," "Bureau of Prisons," "inmate email," and "Trulincs"), *with* ECF 53-3 at 14 (NACDL requested records related to "policies, practices, or procedures for requesting copies of inmates' attorney-client emails from the BOP"). So although the Court will require the Government to explain or remedy the apparent discrepancy between the Eastern District of Michigan's declaration and the *Vaughn* index, it will not order the Government to conduct a new search of that office on the basis that its prior search terms were overly narrow.

### 4.  The Southern District of New York

Like with the Eastern District of Michigan, NACDL identifies a supposed discrepancy between the declaration filed on behalf of the Southern District of New York and the records

NACDL ultimately received. *See* ECF 54 at 22. The declaration, NACDL argues, asserts that the "search yielded only three documents." *Id.* NACDL, however, points out that it received a fourth document from the Southern District of New York. *See id.* (citing Exhibit C.6).[5]

There is no discrepancy here. One of the three documents described in the declaration was a file titled "SDNY TRULINCS 2017.10.06 Policy." ECF 53-3 at 56. The claimed fourth document that NACDL points to is an email to the Assistant United States Attorneys in the Southern District sent on October 6, 2017, distributing the "new general practice" related to requesting "inmate emails" from the Bureau of Prisons. ECF 54-3 at 22. The Government explains in another declaration that the Southern District "located" "additional documents" that were "related to" responsive policy documents, and that email—distributing the new policy to staff—is almost certainly one of those "additional documents." ECF 56-1 at 3 n.4. In other words, the Government has amply explained the discrepancy NACDL claims to have identified.

### 5. The Northern District of Illinois

NACDL makes the same argument about the Northern District of Illinois' search terms as it made about the Eastern District of Michigan's. *See* ECF 54 at 23. That argument is no more successful here than it was there. Like with the Eastern District of Michigan, the Northern District of Illinois' search was not as narrow as NACDL suggests. In addition to the search term that bothers NACDL—"Consent to Monitoring Agreement"—the office also searched using the terms "BOP Inmate Emails," "Bureau of Prisons," "BOP," and "Trulincs." ECF 53-3 at 33–34. Just as with the Eastern District of Michigan, those include some of the very terms that NACDL says the

---

[5] NACDL's citation to Exhibit C.6 was seemingly an error. Exhibit C.6 is a "memorandum for all wardens" sent from the Bureau of Prisons. ECF 54-3 at 18–19. Exhibit C.7 is an email to all Southern District of New York Assistant United States Attorneys. *See id.* at 21–22. The Court proceeds on the understanding that NACDL intended to cite Exhibit C.7.

office should have, but did not, search for. *See* ECF 54 at 23–24 (listing terms like "inmate emails" and "BOP email policy").[6]

### 6. The Executive Office of the United States Attorneys

Finally, NACDL complains that EOUSA failed "to provide any information on the search it conducted of potentially responsive records referred from" several U.S. Attorneys' Offices. ECF 58 at 11. As NACDL sees it, EOUSA conducted a "multi-layer search," first asking the respective U.S. Attorneys' Offices to search, and then conducting its own search of the records those offices sent to EOUSA. *See* ECF 54 at 21 (analogizing this case to one involving a "multi-layer search").

The two declarations EOUSA filed, however, contradict that characterization. Instead, those declarations explain that after the U.S. Attorneys' Offices sent EOUSA their respective "responsive records," "EOUSA reviewed all records and released *all* non-exempt records." ECF 56-1 at 2 (emphasis added). In other words, EOUSA reviewed the records to determine which ones it would withhold pursuant to a claimed exemption but did not conduct a second level of searching. Instead, it produced "all" records that it was not claiming were covered by an exemption. *Id.*

In arguing otherwise, NACDL says that some districts— the District of Colorado, Southern District of Florida, and Western District of Washington—filed declarations that mentioned responsive records that were neither handed over by EOUSA nor listed on the *Vaughn* index as being withheld. *See* ECF 58 at 11 (complaining about the "narrowing of records" from these districts). But EOUSA explained that, per its prior agreement with NACDL's counsel, it "deemed

---

[6] NACDL argues for the first time in its reply brief in support of its cross-motion for summary judgment that the Northern District of Illinois' search was inadequate because its declaration does not describe how various of the terms it searched for "relate to each other." ECF 58 at 14. NACDL is apparently concerned with the Boolean connectors described in the Northern District's declaration and "how [the search terms] work[ed] in conjunction." *Id.* The Court will not pass on this belated argument. *See Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51 (D.D.C. 2015) ("[C]ourts generally will not entertain new arguments first raised in a reply brief.").

nonresponsive" and did not produce "standard AUSA requests for emails from specific criminal cases untethered to policy." ECF 56-1 at 2 n.1. EOUSA also explained that it "did not reproduce records that were duplicative of records [already] produced and/or otherwise already withheld." *Id.* The records mentioned in the declarations NACDL points to largely fall within one of those two buckets—for example, a 2009 EOUSA memorandum that was identified in several other searches, *compare* ECF 53-3 at 21, *with, e.g.*, ECF 54-3 at 25 (describing May 2009 memorandum), and emails related to "criminal prosecutions," ECF 53-3 at 25. Other records mentioned in these declarations are on the *Vaughn* index. *Compare* ECF 53-3 at 30 (Southern District of Florida listing emails, memorandums, and attorney notes as responsive records found), *with* ECF 53-4 at 9 (records 21 and 22 of *Vaughn* index). And one of the declarations NACDL points to—from the Western District of Washington—does not list, quantify, or identify specific responsive records at all, undermining any suggestion that the declaration reveals some unexplained "narrowing of records" on EOUSA's part. *See* ECF 53-3 at 44–45 (testifying only that "[p]otentially responsive records were located and provided to EOUSA").

This is not a case, then, where EOUSA's declaration raises questions about how a larger pool of responsive records was narrowed before production. That sets it apart from *Linder v. Executive Office for United States Attorneys*, 315 F. Supp. 3d 596 (D.D.C. 2018), on which NACDL relies. *See* ECF 54 at 21. There, the United States Attorney's Office in the Eastern District of Virginia filed a declaration that said it initially "identified approximately 1,500 pages potentially responsive" to a FOIA request, before ultimately "provid[ing] the EOUSA with 502 pages of responsive records." *Linder*, 315 F. Supp. 3d at 601. That unexplained gap precluded summary judgment. *See id.* There is no similar unexplained gap here. And, notably, the facts in *Linder*— which, like this case, involved EOUSA—lend credence to EOUSA's testimony that it merely acted

as a conduit to hand over (non-exempt) responsive records it gathered from United States Attorneys' Offices where those records were kept. In *Linder*, it was the Eastern District of Virginia, not EOUSA, that had inexplicably narrowed the list of responsive records. *See id.* Nothing in the record here suggests EOUSA played that role in this case, and because its declaration adequately explains how it processed the records it produced to NACDL, the Government is entitled to summary judgment on this issue.

## B. The exemptions

"In responding to a FOIA request, an agency may withhold information that falls into any of the statute's enumerated exemptions." *Hettana v. CIA*, 145 F.4th 1354, 1356 (D.C. Cir. 2025). The Government has done so here, and NACDL challenges the applicability of several exemptions. At the outset, the Court notes that NACDL has not challenged the Government's foreseeable harm analysis as to any of the withheld records. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I); ECF 54 (no discussion of foreseeable harm in NACDL's brief). The Court finds that the Government has adequately explained the harms it foresees from release of the withheld records. Setting that to the side, the Court walks through each of the objections NACDL has made and concludes that the Government has rightly withheld many documents but must produce some that are not in fact covered by the claimed exemption, while reserving judgment on others over which a factual dispute remains.[7]

---

[7] In its reply brief, the Government "note[d] for the Court that many of [NACDL's] objections to documents withheld by EOUSA were not included in its Amended Complaint." ECF 56 at 20 n.1. NACDL then explained in its reply that the Government continued producing records "after NACDL filed its Second Amended Complaint," and that all of "the records not listed in the Second Amended Complaint that NACDL is challenging were … produced after the Second Amended Complaint was filed." ECF 58 at 8. NACDL also represents that it "remained in regular contact throughout the window during which" the Government "made subsequent productions"—i.e., the period after the Second Amended Complaint was filed—"and NACDL conveyed the scope of its challenges to the newly produced records as the disclosures were made." *Id.* Ultimately, the Court will not resolve any dispute about the propriety of NACDL challenging the records produced after it filed its Second Amended Complaint. The Government has forfeited any argument about this issue "by mentioning it only in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Apprio, Inc. v. Zaccari*, 104 F.4th 897, 910 (D.C. Cir. 2024). The Government included only one sentence on this issue in a footnote, without citation to a case or any authority. In fact, the Court is not sure whether the Government is even objecting on this front, given that it said only

### 1.  Exemption 4

Under FOIA, agencies are not required to disclose "commercial or financial information obtained from a person" that is "privileged or confidential." 5 U.S.C. § 552(b)(4). The Government has withheld portions of two responsive records under this exemption: pages of the TRULINCS User Guide, and a screenshot of the TRULINCS "portal" that was included in a PowerPoint presentation prepared by BOP attorneys for a "litigation training for Assistant United States Attorneys." ECF 53-5 at 14, 25; *see also* ECF 54 at 31 (NACDL describing the second of these records as a screenshot); ECF 54-2 at 83 (the second withheld record).

To justify these withholdings, the Government "must establish that the[se] records are (1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 108 (D.D.C. 2019). The Government has met its burden on the first two elements. But there is a genuine dispute of fact about the third. The Court therefore denies the Government's motion for summary judgment as to these withholdings without prejudice.[8]

#### a.  The records are commercial.

In its opening brief, NACDL relied on a federal regulation to argue that TRULINCS is not "commercial software," thereby rendering the user guide and screenshot not commercial, either. ECF 54 at 30 (citing 48 C.F.R. § 252.227-7014). In its reply, the Government pointed out that the regulation NACDL was citing was issued by the Department of Defense and seemingly has nothing to do with TRULINCS. *See* ECF 56 at 14. In its reply, NACDL abandoned its reliance on

---

that it "wish[ed] to note" the issue "for the Court." ECF 56 at 20 n.1. The Court therefore considers each of the arguments NACDL made in its opening brief.

[8] At this juncture, the Court will not enter judgment for NACDL and order the Government to disclose these records. Because the Government could demonstrate that the exemptions apply through the filing of "additional affidavits or other evidence," the Court exercises its "discretion" to allow the Government that opportunity. *Long v. Immigr. & Customs Enf't*, 149 F. Supp. 3d 39, 53–54 (D.D.C. 2015).

the regulation, not citing it or offering a word in response to the Government's point. *See* ECF 58 at 15–16; *Queen v. Schultz*, 310 F.R.D. 10, 22 (D.D.C. 2015) (noting that a plaintiff can abandon an argument by failing to respond to the defendant's opposition).

The Court does not see any role for the Department of Defense regulation here, and under settled law it is clear that TRULINCS—which was screenshotted to create one of the records at issue—and its user guide are "commercial." Both the user guide and the screenshot of the TRULINCS portal "demonstrably pertain[] to the exchange of goods or services or the making of a profit." *Citizens for Resp. & Ethics in Wash. v. DOJ*, 58 F.4th 1255, 1265 (D.C. Cir. 2023). TRULINCS is sold to the Bureau of Prisons by a private "vendor." ECF 53-5 at 14. The screenshot is merely a reproduction of that vendor's "product[]," and therefore comfortably falls within the ordinary meaning of "commercial." *Citizens for Resp. & Ethics in Wash.*, 58 F.4th at 1265. And the user guide is akin to a "firm's … report[] on its commercial service," which the D.C. Circuit has held constitutes "commercial information," too. *Id.*

### b. The records were obtained from a person.

FOIA defines a "person" to "include[] an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2). NACDL concedes that the user guide was obtained from a "person"—the company that sells TRULINCS—as the term is defined in FOIA. *See* ECF 58 at 16 n.3. It argues, however, that the screenshot was not obtained from a person because it was "created by an individual who work[s] for BOP during the development of an educational presentation about BOP's TRULINCS monitoring capabilities." *Id.* at 17. In other words, because a BOP employee took the screenshot it does not matter that the information being screenshotted (TRULINCS) was provided to the Government by a "corporation … other than an agency." 5 U.S.C. § 551(2).

That argument fails. "The key inquiry is who the source of the information was in the first instance, and not necessarily who created the particular document." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 928 F. Supp. 2d 139, 147 (D.D.C. 2013). It is undisputed that a private company, not BOP, created TRULINCS. *See* ECF 53-5 at 14. That company is "the source of the information" in the screenshot, no matter that BOP technically "created the" screenshot itself. *Elec. Priv. Info. Ctr.*, 928 F. Supp. 2d at 147. Nor is there any suggestion that in taking the screenshot BOP "substantially reformulated" any aspect of the information reflected in the screenshot "such that is no longer a 'person's' information but" is instead "the agency's information." *Occupational Safety & Health L. Project, PLLC v. U.S. Dep't of Labor*, No. 21-cv-2028, 2022 WL 3444935, at *5 (D.D.C. Aug. 17, 2022).

> ### c.  The Court cannot yet determine whether the records were confidential.

That brings the Court to the issue on which there is a factual dispute. "[F]or information communicated to another to be considered confidential," it must "at least" be "customarily kept private, or at least closely held, by the person imparting it." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 434 (2019).

Based on the declaration the Government filed, it is not clear to the Court if the user guide and portion of TRULINCS reflected in the screenshot satisfy that test. On the one hand, the Government's declarant—who, the Court notes, works for the Government, not the company that makes TRULINCS—testifies that those records "are customarily considered confidential in the software industry" and that "the vendor, in fact, treats this information as confidential." ECF 53-5 at 14. The declaration goes on to explain that "the contract with the vendor provides" that BOP "shall not provide or otherwise make available the software or documentation, or any portion thereof, in any form, to any third party without the prior written approval of" the vendor. *Id.* Those bits of testimony suggest the information is confidential: The vendor "customarily do[es] not

disclose" this information "or make it publicly available," and the Government has "promised [the vendor] that it will keep their information private." *Argus Leader Media*, 588 U.S. at 434–35.[9]

On the other hand, the Government's declarant testifies that the user guide "represents pages of application that staff *and inmates* may see depending on their respective use privileges." ECF 53-5 at 22 (emphasis added). The Government does not make clear in its declaration, however, whether the portions of the user guide it is withholding are available only to employees— and if so which employees—or if instead they are available to some (or all) of the people in BOP's custody. Nor does the Government's declaration indicate whether the screenshot of the "portal" that it withheld is a "portal screen" that is viewable only by employees, or if it instead is a screen that incarcerated people (or even the third parties contacting them) see.

As NACDL points out, "BOP houses some 154,000 incarcerated individuals." ECF 54 at 32.[10] Whether the withheld records are available to all of those incarcerated people or are available only to employees is material to determining whether the records are confidential. As other courts in this district have explained, while "[l]imited disclosures, such as to suppliers or employees, do not preclude protection under Exemption 4," "disclosures … made to the general public" do. *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 802 F. Supp. 2d 185, 205 (D.D.C. 2011). Applying that principle, courts have considered whether "[d]issemination within [a] company is … limited to a select few employees," whether the information "is shared on a need-to-know basis," and whether the company sharing the information asks the government to ensure that government employees "keep [the records] confidential." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No.

---

[9] The Court notes that the relevant question is "how the particular party customarily treats the information, not how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001).

[10] The number today—155,197—is slightly higher than it was when NACDL filed its brief. *See About Our Agency*, Fed. Bureau of Prisons, https://perma.cc/FS68-NMJN.

23-cv-928, 2025 WL 947472, at *8 (D.D.C. Mar. 28, 2025); *Occupational Safety & Health L. Project, PLLC*, 2022 WL 3444935, at *10. Knowing whether every person in BOP custody has access to the records that the Government withheld, and any other information about how the Government maintains the confidentiality of those records, would therefore shed light on the crucial question of whether the records are "both customarily and actually treated as private by [their] owner." *Argus Leader Media*, 588 U.S. at 440. Because the Government's declaration leaves those questions unanswered, the Court denies the Government's motion for summary judgment as to the records withheld under Exemption 4.

### 2.  Exemption 5

Also exempt from FOIA's coverage are "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption protects documents "normally privileged in the civil discovery context," including those shielded by attorney-client privilege, the attorney-work product doctrine, and "what is sometimes called the 'deliberative process' privilege." *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1113 (D.C. Cir. 2004); *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). The Government invokes all three of those privileges in withholding documents under Exemption 5 here. The Court, however, need only address the deliberative process privilege and work product doctrine. That is because NACDL only challenges the Government's decision to withhold two documents under attorney-client privilege, and the Court affirms the withholding of those same documents in full under the work product doctrine.[11]

---

[11] *See* ECF 54 at 44 (challenging EOUSA records 4 and 13 based on attorney client privilege); ECF 53-4 at 2, 6 (same records also withheld in full under work product doctrine); *infra* 34–36 (affirming withholding of records 4 and 13 under work product doctrine).

### a. The deliberative process privilege

The Government relied on the deliberative process privilege to withhold documents from the Bureau of Prisons, the Criminal Division of the Department of Justice, and EOUSA. The Court finds that many of these documents are exempt under that privilege, but that some are not and therefore must be produced unless they are covered by another exemption. For a small handful of records, the Court cannot yet determine the applicability of the privilege, so it leaves it to the Government to come forward to supplement the record. Taking the offices one after another, the Court walks through those conclusions.

Beginning with the Bureau of Prisons: NACDL challenges only one of the records BOP withheld under the deliberative process privilege. *See* ECF 58 at 18 n.4 (abandoning challenge to the second record addressed in opening brief). That record is described by BOP as an "Inmate Communication Monitoring … Decision Paper." ECF 53-6 at 4. As a BOP employee explains, "[d]ecision [p]apers are prepared by BOP staff, particularly executive level staff[,] to explore policy positions of the agency." ECF 56-2 at 4. This decision paper "concerned deliberations" among "senior level BOP staff" about "different approaches for monitoring [v]ideo [c]onferencing," which was soon "going to be rolled out" "for use by inmates across the BOP." *Id.* The paper was in "draft" form, and it "identified several decision points" on which "each senior BOP staff provided his or her feedback." *Id.* Among those whose "positions" are reflected in the draft "are senior level managers within the several divisional offices of the BOP," "several BOP Regional Directors … who manage BOP facilities within their respective region[s]," and "Assistant Directors … who are members of the Executive Staff for the BOP." *Id.* at 5.

This evidence is sufficient to establish that the record is covered by the deliberative process privilege. The privilege "covers documents reflecting advisory opinions, recommendations[,] and deliberations comprising part of a process by which governmental decisions and policies are

formulated." *Klamath*, 532 U.S. at 8. That description fits this record to a T: The document includes "recommendations" and "deliberations," *id.*, about a soon "to be rolled out" policy governing BOP's "monitoring" of "[v]ideo [c]onferencing" within its facilities. ECF 56-2 at 4.

In arguing otherwise, NACDL raises two objections. First, that the record "is … at least partially descriptive" of existing policy, rather than pre-decisional, and second that a record should have been released which "captures the final policy or policies" that were adopted based on these deliberations. ECF 58 at 19. The first argument is disproved by BOP's sworn declaration, which unequivocally states that the record is a "draft" "[d]ecision [p]aper" discussing "advantages and disadvantages" of various "approaches for monitoring [v]ideo [c]onferencing." ECF 56-2 at 4. The record is therefore not BOP's "effective law [or] policy" governing how it conducts that monitoring but is instead the "agency's group thinking in the process of working out its policy." *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 7 (D.C. Cir. 2014). That brings it within the privilege. NACDL's second argument is not really an argument about the deliberative process privilege at all but is really a complaint that BOP's search did not turn up a document NACDL thinks must exist. *See* ECF 58 at 19–20 ("It is logical that a final policy was reached involving the monitoring of video conferencing, but BOP has failed to produce that policy."). NACDL did not make any arguments about the adequacy of BOP's search and its oblique reference to the issue in its reply brief is certainly not enough to preserve it for the Court's review.

Turning next to the Criminal Division's deliberative process withholdings: NACDL challenges 23 records that division claimed were covered by the privilege. *See* ECF 58 at 20.[12] Those records are "emails and email chains which discuss the subject of BOP's policy pertaining to the practice of permitting inmates' access to email communications." ECF 53-7 at 11. In its

---

[12] In its reply, NACDL abandoned two additional challenges it had made to the Criminal Division's deliberative process designations. *See* ECF 58 at 18 n.4.

opening brief, NACDL argued that these records are not covered by the deliberative process privilege on the basis that they "post-date the adoption of the policy to which they relate" and therefore "describe, rather than deliberate about, current agency policies." ECF 54 at 36. A supplemental declaration filed in the Government's reply clears up that concern, explaining that these emails all "relate to altogether *new issues* which … ar[ose] as a result of the creation of" a previous policy. ECF 56-3 at 9–10.

Shifting ground slightly, NACDL counters in its reply that the records are nonetheless still not covered because they "relate to the implementation of an existing policy, not the development of a new one." ECF 58 at 20. NACDL is correct that the Government needs to demonstrate that the records were "generated as part of a *definable* decision-making process," and that the Court "must be able to pinpoint an agency decision or policy to which the [records] contributed." *100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 151 (D.D.C. 2017); *Senate of P.R. v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987). And NACDL is also right that this requirement relates to the "timing" aspect of the deliberative process privilege: The record must have been "generated before the adoption of an agency policy." *100Reporters LLC*, 248 F. Supp. 3d at 152; *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006).

Although NACDL is right on the law, the Government has largely satisfied these requirements. The Criminal Division has described each record that was withheld and identified discrete decisions to which they relate: determining "what steps" a specialized section within the Criminal Division should recommend to BOP as the "best legal approaches to follow in order to engage in the monitoring of inmate email communications," how a particular AUSA should "obtain inmate electronic communications" in a way that is most "practicable and legally defensible," whether "a recent Third Circuit decision" has "any applicability or impact upon the

26

issue of inmate email services," and other specific, forward-looking deliberations that will shape agency decisions. ECF 56-3 at 4–7. The Government was "not required to link each document to a specific action," and it has done enough to "tie the materials to some definable" decision-making "process[es]" such that the Court can be confident the records are "predecisional and deliberative." *100Reporters LLC*, 248 F. Supp. 3d at 152–53.

There are, however, three exceptions in the Criminal Division's withholdings. The Government describes Criminal Division documents number three and four as, respectively, email messages from BOP staff "alert[ing] and advis[ing]" of "changes" to the TRULINCS program that "have been and/or are being implemented by the BOP," and as an "alert from BOP … concerning certain aspects of the [TRULINCS] program which have or have not been implemented." ECF 56-3 at 5; ECF 53-8 at 5. Because both of those records describe "decision[s] the government has already made," neither is shielded by the deliberative process privilege. *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). To the extent these documents are not covered by Exemptions 6 or 7(C), the Court therefore orders the Government to produce them. *See 100Reporters LLC*, 248 F. Supp. 3d at 154 ("Federal courts have the authority to order agencies to produce any records that have been withheld improperly.").[13]

The Court is also unable to decide at this stage whether Criminal Division document 22 has been properly withheld under the deliberative process privilege. The Criminal Division's *Vaughn* index explains that this document is a request from the chief of a section within the Criminal Division asking for "input or assistance" from staff in "identifying specific AUSAs[]" who have used inmates to testify in their cases, and whether the same inmates were permitted

---

[13] As explained below, the Court also rejects the Government's withholding of Criminal Division records three and four under the work product doctrine. *See infra* 34. But the Government also withheld portions of these records under exemptions 6 and 7(C), and NACDL has not challenged those withholdings. *See* ECF 53-8 at 4–5; ECF 54 at 28 n.17.

and/or allowed access to the BOP inmate email program." ECF 53-8 at 28–29 (document number 22). The record then includes "direct responses" to that request. *Id.* at 29. Unlike other documents for which the Government has identified specific decisional processes at work—for instance, determining what recommendations to make about an issue or deciding how a particular AUSA should proceed in a given case—the Government has not explained what "*definable* decision-making process" was underway when the section chief solicited this input. *100Reporters LLC*, 248 F. Supp. 3d at 151. On this record, the Court cannot "make a *de novo* determination" either way of whether this document is covered by the deliberative process privilege. *Id.* at 154. The Court will therefore afford the Government an opportunity to "supplement[]" the record, rather than compelling production at this time. *Id.*

Turning finally to EOUSA: NACDL argues that 10 of the records EOUSA withheld under the deliberative process privilege are not exempt under that privilege. *See* ECF 58 at 21.[14] The Government enjoys mixed success on this front. It has justified some of these withholdings, but others either require additional explanation.

The Government has sufficiently demonstrated that EOUSA documents 2, 3, and 24 through 27 are covered by the deliberative process privilege. Those documents include an email sent within the United States Attorney's Office for the Eastern District of Pennsylvania to a "[w]orking group" containing "legal analysis" and a "discussion of future steps" with regard to a "BOP email policy change," as well as a memorandum shared in that office also "containing legal analysis" and "discuss[ing] [a] proposed plan." ECF 53-4 at 1–2. Documents 24 through 27 were similarly "generated before the adoption of an agency policy" and "reflect[] the give-and-take of

---

[14] NACDL initially challenged more of EOUSA's withholdings under this privilege, ECF 54 at 33, but EOUSA then dropped its assertion of the deliberative process privilege for some of the records challenged, ECF 56 at 20 n.2, and NACDL abandoned one of its challenges, too, ECF 58 at 13 n.4.

the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Those documents include "AUSA to AUSA email communication[s] contemplating a response to" a senior official's "inquiry on email screening procedures," internal emails "concerning *possible* action in the" United States Attorney's Office "after Federal Detention Center changes," as well as a request for "input" from Assistant United States Attorneys regarding "draft, proposed … templates for obtaining inmate emails and calls" and "draft changes" for certain "protocol[s]." ECF 56-1 at 5 n.8 (emphasis added).

Many of these documents flowed between "junior" employees—Assistant United States Attorneys—or from those "junior" staff to more "senior" ones—like the input sent to the Director of EOUSA. *Access Reports v. DOJ*, 926 F.2d 1192, 1195 (D.C. Cir. 1991); *see, e.g.*, ECF 53-4 at 10. "A document from a junior to a senior is likely to reflect his or her own subjective opinions," *Access Reports*, 926 F.2d at 1195, not, as NACDL suggests, the agency's final policy, *see* ECF 58 at 21–22. So too is it a good indicator that these documents are deliberative and predecisional that several are identified as "drafts." *See* ECF 53-4 at 11 (documents 26 and 27); *ACLU v. DOJ*, 655 F.3d 1, 18 (D.C. Cir. 2011) (labelling on *Vaughn* index of documents as "Draft Application" and "Template Application … suggests that they are internal drafts containing information that may be covered by the deliberative[ ]process" privilege).

When it comes to documents 11 and 21, on the other hand, the *Vaughn* index and declaration are insufficient to establish the applicability of the privilege. Document 11 is described only as emails sent on two different dates "regarding Trulincs email system," the first between a "third party" and "AUSAs," and the second from "AUSA to AUSA." ECF 53-4 at 5. There is no indication whatsoever as to the "decision or policy to which" these emails "contributed." *Senate*

*of P.R.*, 823 F.2d at 585.[15] Document 21, for its part, is described as an email from the "Criminal Chief" in the Southern District of Florida to AUSAs that includes "analysis of filter team process." ECF 53-4 at 8. Messages "from senior to junior" staff like this one are "far more likely to … be the denouement of the decisionmaking rather than part of its give-and-take." *Access Reports*, 926 F.2d at 1195. That the email includes "analysis," ECF 53-4 at 8, however, might suggest that it does not "contain instructions to staff explaining the reasons for a decision already made," but instead is part of a "process leading to a final decision." *Coastal States*, 617 F.2d at 868. As it was with Criminal Division document 22, the Court cannot yet "make a *de novo* determination" of whether either of these records are exempt. *100Reporters LLC*, 248 F. Supp. 3d at 154.[16]

### b. Attorney-work product doctrine

The work product doctrine holds that "materials prepared by one's attorney in anticipation of litigation are generally privileged from discovery by one's adversary." *Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Just. Exec. Off. for U.S. Att'ys* (*NACDL*), 844 F.3d 246, 250 (D.C. Cir. 2016). Several of the documents the Government withheld under this doctrine to which NACDL objects were also withheld in full based on the deliberative process privilege. To the extent the Court has already upheld the Government's withholding under the deliberative process privilege, it does not

---

[15] EOUSA record 11 was also withheld under the work product doctrine, and NACDL did not specifically challenge that designation. *See* ECF 53-4 at 5; ECF 54 at 40 n.27. NACDL did, however, explain that the Government's "threadbare description[]" of EOUSA record 11 "did not provide" it with "sufficient information to assess the applicability of the named privileges." ECF 54 at 52. The Court agrees. Unlike with other documents that were withheld under multiple privileges not all of which NACDL challenged, *see infra* 30 n.16, the Court therefore declines to affirm the Government's withholding of EOUSA record 11 under either the work product doctrine or deliberative process privilege. But the Court leaves open the possibility that, with additional information, the Government could establish the applicability of either privilege.

[16] The Court does not decide whether a few of the EOUSA records that the Government withheld under the deliberative process privilege are covered by that privilege, because the same records are exempt from disclosure under the work product doctrine. Those are EOUSA record 23, *see infra* 32, EOUSA record 19—whose withholding under the work product doctrine NACDL did not challenge, *see* ECF 54 at 40 n.27; ECF 58 at 13 n.4—and EOUSA records 4 and 13, *see infra* 34–36.

address the same documents again here.[17] Instead, the Court only addresses NACDL's objections

to work product withholdings insofar as the records were either not withheld under the deliberative

process privilege or whose withholding under that privilege the Court did not affirm.[18]

The thrust of NACDL's argument as to all of these documents is that the Government has

not demonstrated that they "were prepared in anticipation of litigation." ECF 54 at 40. NACDL is

right that "[n]ot every document created by a government lawyer … qualifies for the privilege."

*NACDL*, 844 F.3d at 251. Instead, the Government must satisfy "a 'because of' test": "whether, in

light of the nature of the document and the factual situation in the particular case, the document

can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* That

means that "the attorney who created the document must have had a subjective belief that litigation

was a real possibility, and that subjective belief must have been objectively reasonable." *Id.* But

there is no requirement that the document be "prepared in anticipation of litigating a specific

claim." *Id.* at 253.

Many of the documents at issue meet these requirements. BOP records c2 and g2, for

instance, are both "Legal Hold Protocols." ECF 53-6 at 1, 3. These protocols contain "legal

analysis and rationale" that BOP uses to make decisions about the "issuance of legal holds in

anticipation of litigation." ECF 53-5 at 15. In other words, the documents exist because of

"foreseeable (even inevitable) litigation," and they "address[] how attorneys on one side of an

---

[17] The documents that fall into this category are Criminal Division records 1, 2, 9, 10–12, 14–17, 19, 20–21, 24, 26–28, and 31–33, along with EOUSA records 2, 3, and 24–27. *See* ECF 54 at 40 n.27 (challenging these records); ECF 58 at 18 n.4 (abandoning one challenge in reply); ECF 53-4 (EOUSA *Vaughn* index indicates that each of these records were withheld in full under deliberative process privilege); ECF 53-8 (same for Criminal Division's *Vaughn* index).

[18] Those records are: BOP records R1, c2, g2, and j, Criminal Division records 3, 4, 8, and 18, and EOUSA records 1, 4, 5, 12–13, 15–16, 18, and 21–23. NACDL also claimed it was challenging Criminal Division record 23, *see* ECF 54 at 40 n.27, but the Criminal Division did not withhold record 23 under Exemption 5, only Exemptions 6 and 7(c), *see* ECF 53-8 at 29. NACDL expressly waived any challenge to "withholdings … under Exemption 6 or 7(C)." ECF 54 at 28 n.17.

adversarial dispute"—the BOP—should prepare for that dispute. *NACDL*, 844 F.3d at 255. As BOP explains, disclosing the protocols would aid potential adverse litigants by "[r]evealing the factors BOP attorneys consider to antic[i]pate litigation." ECF 53-5 at 15. That confirms that the documents implicate a core concern of the work product doctrine: ensuring that attorneys do not litigate "on wits borrowed from the adversary." *Hickman v. Taylor*, 329 U.S. 495, 516 (1947) (Jackson, J., concurring).

The same is true of EOUSA records 1, 5, 12, 15, 16, 18, 21, and 23, which are memoranda and emails "detailing internal strategy and processes regarding prisoner communication protections" and "containing analysis of prisoner email issues," ECF 53-4 at 1, 3, 5–7, 9, "prepared by or at the request or direction of an AUSA in anticipation of legal challenges," ECF 53-3 at 5–6. Among the topics discussed in these emails are "impressions of 6th Amendment applicability" and "professional responsibility guidance." ECF 53-4 at 7. So too with EOUSA record 22, which is a "[c]ircular" with "intra-office guidance" about the "filter team process" that "contain[s] legal analysis" regarding the "need" for and "applicability" of the filter team. *Id.* at 9.

And the Government has likewise demonstrated that Criminal Division documents 8 and 18 were created because of litigation. Document 18 is a discussion about the "efforts made by an AUSA … to obtain a 'named' BOP inmate's email through 'stipulation' with the BOP inmate's defense attorney." ECF 56-3 at 6. The chain "discusses the particulars of the BOP inmate's criminal prosecution," and the emails are being sought "for purposes directly related to that inmate's ongoing criminal prosecution." *Id.* Document 8 is an email chain among attorneys within the Department of Justice's Computer Crimes and Intellectual Property section—which regularly "run[s] complex investigations" and "consult[s] with other departmental attorneys, … particularly[] Assistant U.S. Attorneys" who "utilize the various electronic

surveillance techniques" on which the section has expertise. *Id.* at 3, 5. The attorneys discuss "the subject matter of BOP inmate email monitoring and … the legal procedures" that the section "is considering to propose to other DOJ trial attorneys and AUSAs[] for use whenever they seek to obtain electronic evidence from an internet provider." *Id.* at 5. The "best methods, practices[,] and legal approaches" to be used in criminal investigations and prosecutions discussed in this email chain, *id.* at 5–6, were being "prepared with the litigation of *all* charges and *all* cases in mind." *NACDL*, 844 F.3d at 254. That is sufficient to bring them within the work product doctrine.

The same cannot be said for a handful of other records. BOP item j is an email thread among various Department of Justice components with "comments on [a] proposed BOP rule change concerning inmate emails." ECF 53-5 at 18. The participants are having a "discussion[] on matters of policy," *id.*, and there is no indication that any aspect of the conversation is geared towards litigation. That makes this record look much like the ones at issue in *Coastal States Gas Corporation v. Department of Energy*, where the D.C. Circuit held that "memoranda drafted by Department of Energy lawyers to assist Department auditors in interpreting agency regulations" were not work product. *NACDL*, 844 F.3d at 253 (describing *Coastal States*, 617 F.2d 854). Although the audits could "give rise to litigation," litigation was not "sufficiently in mind" at the early stage at which the memoranda were prepared given that they were drafted when "no charge had been made nor was a violation necessarily suspected." *Id.* Much the same here. The regulation at issue in BOP item j could "give rise to litigation," *id.*, but at the stage in which staff are commenting "on matters of policy … before regulation changes are implemented," litigation is too

remote a concern. ECF 53-5 at 18. The Court therefore grants summary judgment to NACDL as to this record and orders the Government to produce it.[19]

Criminal Division records three and four suffer a similar flaw. Both are emails from BOP to the Criminal Division's Office of Enforcement Operations, Special Operation Unit—which "does not initiate or conduct any criminal investigations," ECF 56-3 at 3—"wherein the BOP staff member alerts and advises" that unit "of specific format changes which have been and/or are being implemented by the BOP." *Id.* at 5 (describing record 3); *see also* ECF 53-8 at 5 (describing record 4 as "an alert from BOP to" that same unit "concerning certain aspects of the program which have or have not been implemented"). There is no hint that either of these updates were sent by BOP in contemplation of litigation. Both look like "neutral accounts of government policy," *NACDL*, 844 F.3d at 256—updates about BOP policy. Except insofar as these records are covered by Exemptions 6 and 7(C)—both designations are indicated on the *Vaughn* index, and NACDL did not challenge either of them, *see* ECF 54 at 28 n.17—the Government must produce them.

That leaves only the DOJ Book. The DOJ Book includes "internal guidance for DOJ prosecutors that [is] authored by criminal working groups for AUSA prosecutions." ECF 56-1 at 5. Both BOP and EOUSA withheld sections of the book. *See* ECF 53-4 at 2, 6 (EOUSA documents 4 and 13); ECF 53-6 at 4 (BOP record R1). As both parties recognize, the D.C. Circuit's decision in another case involving NACDL—*NACDL v. Department of Justice Executive Office for United States Attorneys*, 844 F.3d 246 (D.C. Cir. 2016)—provides the necessary framework for applying

---

[19] The Government also withheld BOP record j based on the deliberative process privilege, and in its reply NACDL abandoned its challenge to that withholding. *See* ECF 58 at 18 n.4. Because the Government withheld record j in part and it is not clear to the Court whether there might be parts of the document which were only withheld under the work product doctrine and not the deliberative process privilege, the Court leaves it to the parties in the first instance to determine whether some previously withheld portion of record j can be produced.

the work product doctrine to the DOJ Book. *See* ECF 56 at 23–24 (Government discussing the case); ECF 58 at 22–23 (NACDL discussing the case).

In *NACDL*, the court addressed the application of the work product doctrine to the Department of Justice's "Federal Criminal Discovery Blue Book." 844 F.3d at 249. "The Blue Book is a manual created by the Department to guide federal prosecutors in the practice of discovery in criminal prosecutions." *Id.* "[A]ccount[ing]" for "the nature, content, and function of the Blue Book," the court concluded it could "fairly be said to have been prepared because of the prospect of litigation," and that it "therefore consist[ed] of protected attorney work-product." *Id.* at 252. In explaining its decision, the court contrasted the Blue Book with "the United States Attorneys' Manual"—known as the Justice Manual—a "publicly-available document[] … which set[s] out statements of agency policy." *Id.* "[M]aterials serving no cognizable adversarial function, such as policy manuals, generally" do "not constitute work product," the court noted, and the Justice Manual, it said elsewhere, was that sort of "neutral account[] of government policy." *Id.* at 255–56. Latching onto the distinction the court drew between the Justice Manual and the Blue Book, NACDL argues that the DOJ Book at issue in this case is "somewhere between" those two documents and that the portions of the DOJ Book the Government has withheld are "statements of agency policy" that are not work product. ECF 58 at 23.

The Court disagrees with NACDL. The portions of the DOJ Book the Government withheld outline "legal analysis … in the areas of recorded telephone calls and inmate email communications," including "attorney[] interpretation of statutory and case law." ECF 53-5 at 20 (BOP's withholdings); *see also* ECF 56-1 at 5 (EOUSA similarly describing the portions of DOJ Book it withheld). The guidance was prepared "in anticipation of legal challenges" and for "uses in federal cases." ECF 56-1 at 5. In other words, the portions of the DOJ Book that were withheld

were "designed to help federal prosecutors prevail in court on behalf of the government." *NACDL*, 844 F.3d at 255. By citing and discussing "particular judicial decisions and other legal sources," these records "tend to reveal the lawyer's thoughts about which authorities are important and for which purposes" when litigating issues that arise from the monitoring of incarcerated people's emails. *Id.* at 256. For all of these reasons, the withheld portions of the DOJ Book are not merely "neutral accounts of governmental policy"—like the Justice Manual—but are instead documents that "impart[] litigation strategy to government lawyers"—like the Blue Book. *Id.*

Confirming that conclusion, and as you would expect of a document prepared for the "adversarial function" of helping government lawyers prevail in litigation, *NACDL*, 844 F.3d at 255, the DOJ Book is "confidential and cannot be accessed by the public." ECF 56-1 at 5. That too makes it look more like the Blue Book, an "internal manual," and less like the Justice Manual, which is "publicly[]available." *NACDL*, 844 F.3d at 252. Every sign points in the same direction: The portions of the DOJ Book that the Government withheld are exempt from disclosure under the work product doctrine.[20]

### 3. Exemption 7

NACDL next challenges the Government's reliance on Exemption 7 to withhold portions of BOP's Special Investigative Supervisors Manual. *See* ECF 54 at 45–46.[21] Exemption 7 applies to "records or information compiled for law enforcement purposes" that also satisfy one of the

---

[20] In *NACDL*, the D.C. Circuit remanded the case to the district court to determine whether the "Blue Book contain[ed] reasonably segregable statements of the government's discovery policy" which, unlike the portions prepared in anticipation of litigation, could be produced. 844 F.3d at 257. As explained below, the Court is denying the Government's motion as it relates to the adequacy of its segregability analysis. Consistent with that ruling, the Court reserves any issue related to segregability within the DOJ Book.

[21] NACDL also challenges the Government's withholding of BOP record 1 under Exemption 7. *See* ECF 54 at 45–46. Because the Court has already granted summary judgment to the Government on its withholding in full of the same record under the deliberative process privilege, it need not address the applicability of Exemption 7 to this record. *See supra* 24–25.

Exemption's delineated subsections. 5 U.S.C. § 552(b)(7). Subsection (E) covers law enforcement information or records whose "production" "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigators or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." *Id.* § 552(b)(7)(E). Subsection (F) applies to records and information whose "production" "could reasonably be expected to endanger the life or physical safety of any individual." *Id.* § 552(b)(7)(F). The Government relied on both of these subsections in withholding parts of the manual.[22]

At the threshold, NACDL does not contest that the manual was "compiled for law enforcement purposes." *See* ECF 54 at 45–46 (no argument on this issue). Nor could it. BOP "conduct[s] law enforcement investigations" within its facilities—"mak[ing] arrests, search[ing] inmates," "seiz[ing] evidence," and more—and the manual "covers every aspect of BOP's specific investigative techniques and procedures." ECF 53-5 at 29. Instead, NACDL argues that, as it pertains to Exemption 7(E), BOP has "not meaningfully describe[d] the techniques or procedures at issue, nor the context in which the techniques are used," that some of the information in the manual is publicly available but "BOP has not differentiated the information withheld in the redactions from that which is publicly available," and that "BOP [has] not demonstrate[d] that the disclosure of this information would create a risk of circumvention of the law." ECF 54 at 47–48. As for Exemption 7(F), NACDL complains that "BOP relie[s] solely on … conclusory recitations" of the law and has not "describe[d] a logical pathway for the redacted information to lead to endangerment." *Id.* at 50.

---

[22] Somewhat confusingly, BOP's *Vaughn* index says that BOP withheld the manual in full. *See* ECF 53-6 at 1 (describing item "a-b" as "WIF"). But NACDL attached the partially redacted version of the manual to its motion for summary judgment, *see* ECF 54-2 at 2–21, and throughout its brief NACDL describes the record as "redact[ed]," *see, e.g.*, ECF 54 at 49.

None of those arguments convince. The first ignores the "fine line" BOP must walk in "describ[ing] why Exemption 7(E) applies without disclosing the very techniques, procedures, and guidelines [BOP] seeks to protect." *Am. Immigr. Laws. Ass'n v. U.S. Dep't of Homeland Sec.*, 485 F. Supp. 3d 100, 108 (D.D.C. 2020). BOP has appropriately toed that line, explaining that the manual consists of "detailed technical analysis of the techniques and procedures used by the BOP to conduct … investigations," including "everything from processing crime scenes, handling confidential informants[,] and referring matters for prosecution." ECF 53-5 at 29, 31; ECF 56-2 at 6. At the same time, BOP explained that it could not further describe the techniques at issue—or even "reveal[] certain topical headings within" the manual—because doing so would be "tantamount to revealing the investigative technique." ECF 56-2 at 6. A review of the unredacted portions of the manual that BOP produced confirms as much. The table of contents for the chapter BOP turned over lists methods for "[c]ommunication [m]onitoring." ECF 54-2 at 7. To reveal the full list would be to "increase the risks" that people in BOP's custody could violate the law while avoiding the monitoring techniques that might otherwise reveal their criminal activity. *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009). That is precisely the risk 7(E) guards against.

NACDL's second objection to the application of 7(E) fares no better. The organization says some of the redacted information "is publicly available." ECF 54 at 47. In support of that claim, NACDL points to a 2020 report issued by the Department of Justice's Office of Inspector General titled "Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization." *Id.* The audit, NACDL says, "contains seventeen pages of in-depth descriptions and analysis of investigatory techniques, procedures, and guidelines used by BOP for monitoring inmate communications," and "even quotes" from the manual that the Government

withheld here. *Id.* at 48. True enough, "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999); *see also Davis v. DOJ*, 968 F.2d 1276, 1278–79 (D.C. Cir. 1992) (applying that rule to records withheld under Exemption 7). But to avail itself of that rule, NACDL "must" first "point to specific information in the public domain that appears to duplicate that being withheld." *Cottone*, 193 F.3d at 554. The Government's mere disclosure of "similar information" in the audit's description of investigatory techniques "does not suffice." *Citizens for Resp. & Ethics in Wash.*, 58 F.4th at 1271. And the only attempt NACDL makes to point to prior disclosure of the "*specific* information," *id.*, in the manual is its citation to a single page of the audit that quotes the manual, *see* ECF 54 at 48 (citing page 18 of the audit). That quote says only: "these procedures are necessary to ensure public safety, national security, and the orderly operation of institutions."[23] It is unclear to the Court if that quote even appears in the chapter of the manual that BOP identified as responsive to NACDL's request, and even still, that short, non-substantive quote hardly confirms that the Government has decided to reveal the "*specific* information" NACDL seeks.

Nor does NACDL's third argument about 7(E) move the needle. In arguing that BOP has "not demonstrate[d] that disclosure of this information would create a risk of circumvention of the law," ECF 54 at 48, NACDL runs headlong into the "low bar" set by 7(E), *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011). "Rather than requiring a highly specific burden of showing how the law will be circumvented, [E]xemption 7(E) only requires that the agency demonstrate logically how the release of requested information *might* create a *risk* of circumvention of the law."

---

[23] Office of the Inspector General, U.S. Dep't of Just., *Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization* 18 (Mar. 2020), https://perma.cc/C9AP-ZVN3.

*Id.* (emphases added).[24] BOP's declaration easily meets that forgiving standard, describing how "[d]isclosure … could provide an opportunity for inmates to manipulate victims or witnesses to an incident in an effort to improperly influence an investigation," could "chill … cooperation" between "confidential informants" and BOP staff, and could "allow inmates to circumvent internal law enforcement investigations in BOP facilities by revealing how BOP collects information." ECF 53-5 at 31.

NACDL's remaining argument—that BOP's declaration "relie[s] solely on … conclusory recitations" of the law and has not "describe[d] a logical pathway for the redacted information to lead to endangerment," ECF 54 at 50—is trained on the Government's withholding of portions of the manual under Exemption 7(F). Because every part of the manual withheld under 7(F) was also withheld under 7(E), and because the Court has already confirmed the propriety of withholding those sections under 7(E), there is no need to address this argument. *See* ECF 54-2 at 3–21 (no standalone 7(F) withholding). But even if the Court were to pass on the application of 7(F), it would grant summary judgment to the Government on this basis, as well. BOP "provide[d] a reasonably detailed justification" laying out its "reasonable expectation" that disclosure of the manual would lead to the "endangerment" of life. *Nat'l Pub. Radio, Inc. v. FBI*, 539 F. Supp. 3d 1, 9 (D.D.C. 2021). In "correctional setting[s]," BOP explained, there is a "significant risk of contamination or influence of witness[es] by other witnesses and/or other inmates." ECF 53-5 at

---

[24] Recall that Exemption 7(E) applies to records whose publication "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions *if such disclosure could reasonably be expected to risk circumvention of the law*." 5 U.S.C. § 552(b)(7)(E) (emphasis added). There is some ambiguity about whether the italicized bit modifies both of the "techniques and procedures" and "guidelines" clauses, or only applies to "guidelines." *See Pub. Emps. For Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 204 n.4 (D.C. Cir. 2014) (Kavanaugh, J.) (noting disagreement on this issue). The D.C. Circuit "has applied the 'risk circumvention of the law' requirement both to records containing guidelines and to records containing techniques and procedures," so this Court of course does the same. *Id.* If, however, there was no need to demonstrate that disclosure of the "techniques and procedures" "could reasonably be expected to risk circumvention of the law," that would render this argument of NACDL's irrelevant, given that the manual plainly includes "techniques or procedures for law enforcement investigations."

31. Its "investigative techniques … account for the secure and orderly operations of the correctional facilities to ensure inmate and staff safety." *Id.* Disclosure of those techniques, however, "could provide an opportunity for inmates to manipulate victims or witnesses to an incident." *Id.* Unsurprisingly, that could undermine BOP's efforts to ensure no one is "put in jeopardy" by its investigations. *Id.* So too could the degradation of BOP's investigative capacity undermine investigations into dangerous behavior—"drug introductions, weapons introductions," and the like. *Id.* In other words, "undermining the effectiveness" of BOP's investigations could "undermine the security of federal correctional facilities," *id.*, thereby "endanger[ing] the life [and] physical safety" of others, 5 U.S.C. § 552(b)(7)(F). BOP therefore properly withheld the redacted portions of the manual under 7(F).

### C.  Adequacy of the *Vaughn* indexes

In addition to its objections about the merits of the Government's withholding of records, NACDL also complains that the *Vaughn* indexes the Government filed in support of its summary judgment motion suffer multiple flaws. *See* ECF 54 at 50. Several of NACDL's arguments on this front are either mooted by the Court's resolution of other issues or resolved by the Government's reply brief. The Court affirmed BOP's withholding of the DOJ Book on the basis of the work product doctrine, so there is no issue with any shortcomings in the *Vaughn* index's description of that record for purposes of a different exemption. *Contra* ECF 54 at 52. The Court has likewise already held that the declarations and *Vaughn* indexes together provide sufficient detail from which the Court could determine that Criminal Division record 16 is covered by the deliberative process privilege. *Contra id.*; *see supra* 31 n.17. And as the Government confirmed in its reply, EOUSA records six and nine were only withheld in part—"not withheld in full" as NACDL claimed in its opening brief—and were withheld only on grounds that NACDL has not challenged. ECF 56-1 at

7 n.11; *see* ECF 53-4 at 3–4 (*Vaughn* index indicates these records withheld in part on basis of Exemptions 6 and 7(C)); ECF 54 at 28 n.17 ("NACDL is not challenging withholdings by any Defendant under Exemption 6 or 7(C).").

Other of NACDL's arguments, however, have merit. As NACDL points out, BOP record R2 consists of two different PowerPoint presentations. *See* ECF 54-2 at 51–70; *id.* at 71–103. But the *Vaughn* index does not describe either presentation, and the declarations consistently describe it as a single "PowerPoint presentation" without differentiating between the two. ECF 53-5 at 25, 30 ("The PowerPoint presentation"); *see also* ECF 53-6 at 5 (no description in *Vaughn* index). So although "[t]he form of the *Vaughn* index is unimportant and affidavits providing similar information can suffice," *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 998 n.4 (D.C. Cir. 1998), neither the index nor affidavits provide the Court with the necessary "reasonable basis to evaluate the claim of privilege" applied to "particular part[s]" of the two slideshows, *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006).[25]

That problem is even worse when it comes to the BOP and Criminal Division records that were apparently withheld but not described at all in the *Vaughn* indexes or declarations. *See* ECF 54 at 50 & n.34. After NACDL pointed out this problem in its opening brief, the Government explained what was happening with all of the seemingly undescribed EOUSA records. *See* ECF 56-1 at 5–6; ECF 58 at 27 n.6 (NACDL acknowledging that EOUSA provided this explanation and abandoning any challenge on this issue as to EOUSA). The Government did not, however, do anything to account for the unexplained BOP and Criminal Division records.

---

[25] In providing additional information about the two PowerPoint presentations included in record R2, BOP can also clarify the confusion about the origin of the slideshows, which a declaration attributes to "FDC SEATAC," a federal detention facility in Seattle. ECF 53-5 at 25. As NACDL points out, a different slideshow in BOP's production originated at FDC SEATAC, but the presentations in R2 seemingly did not. *Compare* ECF 54-2 at 29–30, *with id.* at 52, 72.

Finally, the description of EOUSA records 11 and 17 is insufficiently detailed to facilitate review of the Government's withholding of those records. The Court already explained the issues with EOUSA record 11 when explaining why it could not yet determine whether that document was covered by the deliberative process privilege. *See supra* 29–30 & n.15. Much the same is true of the description of EOUSA record 17, which says only that the record is a "draft AUSA template" for "seek[ing] emails from BOP." ECF 53-4 at 7.

The Court therefore denies summary judgment to the Government as to its withholding of each of these insufficiently described records and exercises its discretion to "request[] further affidavits" or a supplemental *Vaughn* index that remedies these problems. *Spirko*, 147 F.3d at 997. Once armed with the "information" it needs to "present [its] case," NACDL can raise any objections it may have to the records discussed in this section. *Judicial Watch, Inc.*, 449 F.3d at 146.

## D. Segregability

NACDL also argues that the Government has not provided a sufficiently detailed explanation of its segregability analysis. *See* ECF 54 at 52–54. The Court agrees and therefore denies the Government's motion as to segregability.

"When an agency demonstrates that records contain exempt information"—as BOP, EOUSA, and the Criminal Division have all done—"it is entitled to a presumption that it complied with the obligation to disclose reasonably segregable material." *Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*, 71 F.4th 1051, 1057–58 (D.C. Cir. 2023). "To rebut this presumption, the requester must offer … evidence that would warrant a belief by a reasonable person that the agency failed to comply with its obligation." *Id.* at 1058. Nevertheless, and "despite this presumption," a "district court must … make an express finding on segregability." *Rudometkin v. United States*,

140 F.4th 480, 494 (D.C. Cir. 2025). Crucially, the district court must assure itself that the Government not only assessed whether it was possible to further segregate the "non-exempt portions of the record[s] … from the exempt portions," but also that the Government "reviewed the exempt portions of the documents to assess whether any information could be segregated and released without causing a foreseeable harm to the agency." *Id.*

An attestation that the Government conducted that analysis is "[a]bsent from" the "declarations" in this case. *Id.* Neither of EOUSA nor the Criminal Division anywhere aver that they reviewed the exempt portions and ensured that any "information" that "could be segregated and released without causing a foreseeable harm" was. *Id.*; *see* ECF 53-7 at 20 ("The Criminal Division has reviewed all of these records and determined that there are no reasonably segregable *non-exempt* portions that can be released." (emphasis added)); ECF 56-1 at 8 ("EOUSA has segregated and released the *non-exempt* responsive records to Plaintiff." (emphasis added)). BOP does state that it conducted the requisite analysis "[i]n applying [E]xemption 5." ECF 53-5 at 20 ("In applying [E]xemption 5, the BOP conducted a foreseeable harm analysis on the withheld information and considered whether any information could be segregated."). But BOP also withheld records under other exemptions and does not say that it conducted the required analysis for those records, as well. *See id.* at 28–33 (no similar statement related to segregability of records withheld under Exemption 7).[26] Because "the record is not adequate to support the Government's claim of compliance with FOIA's segregability requirement" absent these assurances, *Rudometkin*, 140 F.4th at 495, the Court denies summary judgment as to segregability and leaves open the possibility that there are portions of records that must be produced.

---

[26] In fairness to the Government, the two D.C. Circuit decisions that clearly articulate this requirement were issued after briefing was complete on the cross-motions for summary judgment. *See Rudometkin*, 140 F.4th at 494; *Leopold v. DOJ*, 94 F.4th 33, 37–38 (D.C. Cir. 2024).

### E. Nonresponsive records

That leaves only NACDL's final objection that "EOUSA and BOP improperly redacted 'non-responsive' information within responsive records." ECF 54 at 54. That issue was fully resolved after NACDL filed its opening brief.

As for EOUSA, it released in full one record it had previously withheld in part as nonresponsive. *See* ECF 56-1 at 7. It also "remov[ed] the nonresponsive designations" from EOUSA record 22 and "replac[ed] them with" work product designations. *Id.* at 6. NACDL challenges the applicability of that designation, *see* ECF 58 at 28, but the Court has already rejected that argument and found that Exemption 5 applies, *see supra* 32 (affirming application of work product doctrine to record 22). EOUSA similarly replaced the nonresponsive designations on a "chart partially disclosed by [the] Northern District of Illinois" with work product designations. ECF 58 at 28; *see* ECF 56-1 at 6 (EOUSA explaining that change). NACDL challenges that work product designation, as well. Unlike with record 22, the Court has not yet passed on this record. Because the record was not designated as work product until the Government's reply and then challenged for the first time in NACDL's reply (a challenge that the Government therefore never responded to), the Court will reserve resolution of this issue for any further summary judgment briefing, should NACDL wish to raise it again then.

Finally, NACDL objects to BOP's decision to produce (partially) only one chapter of its Special Investigative Supervisors Manual, rather than the whole manual. *See* ECF 54 at 55. NACDL characterizes this as a decision to withhold the other chapters as nonresponsive. *See id.* What NACDL ignores, however, is that the chapter BOP produced constitutes the "responsive record," so the Government has not run afoul of the rule against "delet[ing] portions of a responsive record which are *not* exempt." *Shapiro v. CIA*, 247 F. Supp. 3d 53, 74 (D.D.C. 2017) (citing *Am.*

*Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 677–78 (D.C. Cir. 2016)). BOP "determined that it was appropriate to divide a document"—the manual—"into discrete records"— chapters, one of which was responsive to NACDL's request. *Id.* at 75. That record is the unit of analysis, and the Government did not withhold anything from it because it was nonresponsive.

*    *    *

The cross-motions for summary judgment, ECF 53; ECF 55, are each **GRANTED IN PART** and **DENIED IN PART**. The Court summarizes its holdings here:

- The Government has established that it conducted an adequate search except as to the Eastern District of Pennsylvania and the Eastern District of Michigan. Its motion is therefore granted as to all searches except for these two.

- The Government has not established that it properly withheld portions of BOP records C1 (the TRULINCS User Guide) and R2 (the screenshot of the TRULINCS portal) under Exemption 4. The Court denies without prejudice the Government's and NACDL's motions as to those withholdings.

- The Court grants summary judgment to the Government as to its deliberative process privilege withholdings except for Criminal Division records 3, 4, and 22, and EOUSA records 11 and 21. The Government's motion for summary judgment is denied as to those records. The Court grants NACDL's motion for summary judgment as to Criminal Division records 3 and 4 and orders the Government to produce those records, while denying without prejudice NACDL's motion as to Criminal Division record 22 and EOUSA records 11 and 21.

- The Court grants summary judgment to the Government as to its withholdings under the work product doctrine except for BOP record j and Criminal Division

46

records 3 and 4. The Court grants NACDL's motion for summary judgment as to BOP record j and Criminal Division records 3 and 4 and orders the Government to produce those records.

- The Court grants summary judgment to the Government as to its withholdings under Exemption 7.

- The Government is ordered to remedy the issues with its *Vaughn* indexes identified above, and its motion for summary judgment is denied without prejudice as to the withholding of the records that were inadequately described.

- The Court denies without prejudice the Government's motion as to its compliance with its obligation to produce all reasonably segregable material.

- The Court denies NACDL's motion as to the Government's claimed withholding of nonresponsive materials.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: November 20, 2025